Filed 3/26/24  P. v. Mancia CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> EDGAR HERNAN MANCIA, <br><br> Defendant and Appellant. | D080804 <br><br> (Super. Ct. No. SWF1907394) |


APPEAL from a judgment of the Superior Court of Riverside, Timothy F. Freer, Judge.  Affirmed as modified and remanded with directions.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley and Michael J. Patty, Deputy Attorneys General, for Plaintiff and Respondent.

Edgar Hernan Mancia was convicted of second degree murder for the killing of his brother, Daniel. The killing occurred after Mancia and Daniel spent the day together drinking, and eventually got into a fight that was partially witnessed by Mancia's girlfriend, followed by Daniel's disappearance the next day. There were no witnesses to the killing and Daniel's body has never been found.

On appeal from the judgment of conviction, Mancia asserts there was insufficient evidence to support the jury's finding that he intended to kill Daniel. Mancia also argues that the trial court prejudicially erred when it denied his request for juror identifying information based on comments made by members of the jury to Mancia's counsel after the verdict. In an argument we do not reach, Mancia asserts that the trial court prejudicially erred by instructing the jury that a property owner can use reasonable force in defense of that property. As we shall explain, we agree with Mancia that insufficient evidence supported the jury's verdict that Mancia killed his brother with the requisite malice. We reject Mancia's contention that the trial court erred by denying his request for juror identification. Accordingly, we reduce the second degree murder conviction to voluntary manslaughter, affirm the judgment as modified, and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Initial Disappearance*

At the time of Daniel's disappearance, Mancia, his girlfriend J.T., Daniel, and the brothers' parents lived at the parents' home in Hemet in the unincorporated area of Sage in Riverside County. The house is located in a rural area on a seven-acre parcel surrounded by dirt roads and rough terrain including thick brush, hills, gullies, and ravines. Illegal marijuana operations are known to exist in the area. On the last day that Daniel was

2

seen, the Sunday of Father's Day 2019, Mancia and his girlfriend woke up together at the home around 8:00 or 9:00 a.m. The couple then got into a brief argument. Shortly after, J.T. left to visit her father to celebrate the day with him in Perris about an hour from the Mancia family home.

Mancia's mother, M.M., and father were also home that morning. M.M. worked night shifts and woke up that day around 12:30 p.m. Her husband was home and her two sons were out together, running errands in Hemet. By all accounts at trial, the brothers had a good relationship and were close friends. Mancia and Daniel returned home shortly after M.M. woke, and M.M saw her sons hanging out together between 1:00 p.m. and 3:30 p.m., when she left for work. M.M. saw them leave the house in a Jeep Cherokee owned by the family and drive up a nearby hill on the property that they often visited for the views.

Mancia told investigators that he and his brother had gone to town to run errands and before returning home purchased a bottle of Remy Martin and a 12-pack of Coors, which they started drinking on the drive back home. According to Mancia, they drove up the hill to continue drinking away from their parents, who did not approve of alcohol. M.M. did not talk to her sons that day before she left for work. Mancia's father left for his job in Ocotillo, where he stayed during the week, around 4:00 p.m. After their parents left, the men returned to the house and continued to drink.

Later that evening, J.T. texted Mancia that her uncle had given her a new puppy and Mancia responded that he wanted her to bring it home. J.T. got home around 9:15 or 9:20 p.m. with the puppy. When she opened the door, she saw Mancia asleep on the living room floor in just his boxer shorts, something that was not unusual for Mancia. J.T. woke Mancia up to help her with the new dog, but it took her several minutes and Mancia seemed

3

groggy—she said he was talking but not making sense. When he finally woke up, J.T. told Mancia to put on clothes to go outside and help her get the new dog. Mancia resisted and they argued. Mancia was highly agitated.

The couple walked outside, but then Mancia angrily went back inside the house and slammed the front door, leaving J.T. outside. J.T. followed Mancia inside, and heard Mancia throwing things in the bathroom. J.T. heard objects falling and saw Mancia punching through the bathroom door, causing it to splinter and break. Over the course of their two-year relationship, J.T. had never seen Mancia act in such an aggressive, destructive manner.

During this commotion, Daniel came out of his bedroom next to the bathroom. Daniel demanded to know what was going on and the brothers exchanged harsh words. At one point during the exchange, Daniel asked Mancia, "do you want me to fuck your shit up?" Mancia responded, "Come on, let's fight." J.T. then witnessed Daniel, who was taller and heavier than Mancia, push Mancia against the wall in the bathroom.

J.T. was scared and went to the kitchen to grab a trash bag so she could collect her belongings from the house and leave. J.T. had recently contemplated ending the relationship, and Mancia's behavior that night was the final straw. J.T. went upstairs to the bedroom she shared with Mancia to pack her things. She could hear the men continue to physically fight each other downstairs. As J.T. collected her belongings, she heard the fighting continue. Just before she left the house through an upstairs exit, J.T. looked over the staircase and saw Mancia's legs lying on the hallway floor. She heard Mancia say, "I hope God saves you," and Daniel respond that he didn't need saving. She also heard one of the men say the other was bleeding; she

4

was unsure which brother had spoken. The argument stopped, J.T. assumed the fight had ended, and she left in her car around 9:40 or 9:50 p.m.

Before she left, J.T. did not see any blood and she did not witness Daniel choking Mancia. After she left, as soon as she reached the main road, J.T. called M.M., but did not reach her. Because of the severity of the fight, J.T. considered calling the police, but ultimately decided not to call. J.T. drove to her mother's house in Perris. There, she sent Mancia a text message apologizing for leaving during the fight, but she did not receive a response.[1] That night J.T. also wrote a journal entry in her phone's note application, stating that she was shaken by the fight, that she was not used to that type of "extreme" violence, and that she was concerned by it.

M.M. returned home from work just before 4:30 a.m. early Monday. She was eager to get home after listening to J.T.'s voicemail. When she opened the door she saw two baskets of clean laundry flipped over in the living room and other debris, the broken bathroom door, the lights on, and the doors inside the house open. Neither of her sons were in the house. She saw no blood in the house.

After searching the house and calling her sons, M.M. heard the family's dogs outside barking. She went outside and saw Mancia stumbling towards the house with his BMX bike. She thought that Mancia appeared drunk and she smelled alcohol on his breath. She testified he was wearing blue jeans and a black or grey sweater. Mancia asked his mother if she had seen him

---

[1] The Attorney General states that at 2:47 a.m. Mancia read the text message from J.T. The record, however, does not support this factual allegation. While on the witness stand, the lead investigator reviewed the text message records from Mancia's phone. He testified that People's exhibit 65 or 66, which are printouts of activity on Mancia's phone, showed a "read receipt" of the text from J.T. The documents, however, do not contain this information.

5

waiting by the side of the road. He said he was waiting for either her, Daniel, or J.T. to come home. Mancia told his mother he did not know where Daniel was. M.M. was worried about Daniel, whose Toyota Corolla was also missing. She thought he could be drunk driving. M.M. called and texted Daniel again, but got no response.

According to M.M.'s testimony, Mancia and M.M. went back into the house, and Mancia laid down on his parents' bed. He told his mother he was hurting and kept touching his neck and upper chest. M.M. noticed red marks on his neck and swelling on his face. Mancia told his mother that he and Daniel had been in a fight and that when he woke up he "was on the floor and [he] felt like [he] was choking." M.M. then went into Daniel's room, where she found his cell phone. M.M. walked around the property to see if she could find Daniel, who was known to drive to other parts of the property when he was upset.

When she didn't find him, M.M. began calling police stations and hospitals in the area. M.M. also called Daniel's work, where he was expected at 6:00 a.m. that morning. Daniel's coworkers told M.M. that Daniel had not arrived and they were concerned because it was out of character for him to be late. M.M. then drove to the home of family friends who lived in San Jacinto, where Daniel and Mancia would sometimes stay the night. The house was dark and M.M. did not see Daniel's car, so she returned home.

Later that morning, around 10:30 a.m., a citizen notified Riverside County sheriff's deputies that Daniel's Corolla was abandoned at an intersection about five miles from the Mancia home. Deputies drove to the scene and noticed the car was locked, the right front tire was flat, and the right side of the car was parked against an embankment. A .308 caliber bullet casing was later found under the front passenger floor mat of the car.

6

From the Mancia house to where the Corolla was located, there were several different available routes to travel by car or bicycle. One investigator opined that there were at least four access points to the Mancia home from where the Corolla was located. The jury was shown a video depicting one way to drive from the Mancia residence to the Corolla, along with videos depicting the drive back to the Mancia residence in both daytime and nighttime conditions. An investigator opined that a Corolla could traverse this route even though there were potholes and some bumpy parts of the road. In addition, a sheriff's deputy testified that a BMX bike could navigate from the Mancia house to where the Corolla was found. A deputy also opined that a BMX bike could fit in the back seat of the Corolla if a seat was pushed forward.

After the sheriff's deputies found the Corolla, they determined it was registered to a person with the last name Mancia, whose address was the Mancia family home. The deputies went to the home around 11:00 a.m. and Mancia answered the door. He was confused, but did not seem panicked, fearful, or surprised. Mancia told the deputies that Daniel usually drove the vehicle and that Daniel had not come home the prior night.

When M.M. got back from San Jacinto, Mancia told her the sheriff's deputies had found the Corolla, but not Daniel. M.M. grew more concerned and Mancia suggested they should call someone to help find Daniel. M.M. called her brother, a police officer in central California, and he called the Riverside sheriff's department to initiate a missing person report. M.M.'s brother told her Daniel's Corolla would be impounded if it was not moved, so she, J.T., and Mancia went to pick up the car using a spare key. The three looked around the area for Daniel or any sign of him. While Mancia changed

the tire, M.M. and J.T. continued to search the area, and then they brought the car back home.

Later that day, Mancia and J.T. drove the family's Jeep Cherokee to get the puppy, which she had left at her parents' house. The puppy was bleeding from a cut, and nonhuman blood was later found in the Jeep. Mancia and J.T. also found Daniel's wallet in the Jeep. Sometime later, M.M. had Mancia remove and replace the bathroom door. In the days and weeks that followed his disappearance, Daniel's family, friends, and law enforcement conducted extensive searches for him, which included handing out and posting flyers, search parties, and the use of drones, helicopters with heat sensing capabilities, offroad vehicles, and trained dogs.

2. *Additional Investigation & Arrest*

On the second day after Daniel's disappearance, friends and other family members came to the family's home to help the Mancias look for Daniel. In the evening, law enforcement officers arrived at the Mancia home. The officers investigated the house. Sometime before law enforcement arrived, M.M. went into Daniel's bedroom and found her ATM card, which she had given him, in a pair of his pants on the floor. M.M. testified that one of the three sets of keys for the Toyota Corolla was missing. M.M. also told law enforcement that Daniel was supposed to leave for a planned vacation to Mexico with his uncles the next day, and he would not want to miss the trip. Investigators determined that there were no transactions on any credit cards or banking accounts tied to Daniel after the night of the fight.

While at the house, law enforcement located Mancia's BMX bike to the right of the front door leaning up against the house. They found a pair of tan pants in Mancia's hamper that had a small amount of blood on the lower legs. Blood was also found on the rear bumper of the Jeep. The blood was not

8

visible to the eye and was discovered after a forensic technician applied a chemical reactant to the area. A criminalist who performed DNA analysis of the blood samples testified that his testing showed strong evidence that the blood on the Jeep came from a child of M.M. and her husband, and also that Mancia was excluded as the source of the blood, indicating the blood was Daniel's. The blood on the pants did not result in any DNA identification.

The investigation also showed that the Mancias had multiple guns at the residence. During the search of the property, sheriff's deputies found a bolt action .308 caliber rifle, which belonged to Mancia's father, under a tree on the southwest corner of the property. According to one of the investigators, if a .308 rifle is fired, the shell does not eject—it stays inside of the gun, and there was no shell inside the rifle. No shell casing or blood was found near the rifle. Mancia's father told investigators that the rifle should not have been in that location and was usually stored in his bedroom.

In Daniel's room, investigators found a .22 caliber rifle, various types of bullet casings, and ammunition. In the parents' bedroom, investigators found a file case under the bed with two boxes of .22 caliber ammunition, a .22 caliber rifle, and a pellet gun. In addition, they found shell casings and live ammunition for the .308 caliber rifle along with two boxes of ammunition for a .40 caliber handgun.

A neighbor of the Mancias who lived approximately 400 feet away heard a gunshot around 11:00 p.m. the night of the brothers' fight. The neighbor testified he thought the gunshot came from a couple hundred feet away, north of the Mancias' house. When he heard the shot, he went outside with his own gun to inspect but he did not see anything in the area. He also testified that it was not unusual to hear gunfire in the area. The neighbor testified he had familiarity with firearms due to his 26-year military career,

9

and that he believed that the gunshot came from a small caliber rifle or a handgun, not a .308 caliber rifle.

At the Mancia residence, investigators asked Mancia to come to the Riverside Sheriff's station for questioning. He agreed, and was interviewed by investigators over the course of several hours, beginning just after 1:00 a.m. The interview was recorded and played for the jury. It took place in two parts, the first session of questioning was an hour in length and the second 45 minutes. After the first part, the investigators determined that Mancia would be arrested for the murder of his brother. Before the second part, he was read his *Miranda* rights.

During the interview, Mancia told the investigators in detail about the afternoon that he and Daniel had spent together that Sunday. They went together to Hemet, where Daniel got a haircut and Mancia went to Wal-Mart. The brothers then purchased a bottle of Remy Martin cognac and some Coors beer and headed back home. They started drinking beer on the drive home, and then once home continued drinking together in the Jeep out on the hill.

Mancia said they returned to the house after their parents left for work, and eventually got very drunk. Both went to sleep or passed out before J.T. arrived. Mancia passed out on the living room floor and Daniel went to his room.[2] He repeatedly told investigators his memory of the events was very foggy and that he had been intoxicated. Mancia said that J.T. woke him up and they got into an argument, then he went into the bathroom and punched the door. Mancia said that Daniel then came out of his room and charged Mancia, throwing him against the bathroom wall. The fight

---

[2]	Mancia also told the investigators that Daniel was a heavy drinker and drank every day. He said that Daniel had become aggressive in the past nine months and his parents had noticed a change in behavior, which Mancia attributed to Daniel's increased drinking.

continued into the hallway and living room, where Daniel got on top of Mancia and started choking him.  Mancia said he lost consciousness and awoke several hours later, with his hands above his head.  Mancia said he snuck out of the house, wearing only his boxer shorts and without his cell phone, grabbed his bike from a shed and hid on the property for two hours until his mom returned.  Mancia explained that he hid because he was scared and confused.

When the investigators pressed Mancia for more details about the fight with his brother, Mancia said that when he woke there were dishes, forks, and spoons everywhere, which made no sense to him.  When asked about J.T.'s comment that she heard one of the men say there was blood, Mancia said he did not remember this and he "didn't grab anything to hurt [his] brother."  The investigators pressed him for more information about what happened to Daniel, and Mancia repeatedly stated that he did not know.

Eventually, Mancia admitted that he had grabbed forks from the kitchen, which Mancia said enraged Daniel further, and that Mancia was swinging at Daniel with the forks.  He denied swinging a knife at Daniel.  Mancia told the investigator that he "went for the dishes.  All the things in the dishes, I grabbed them.  There were knives, forks, everything.  ... And I just–I use[d] 'em as my guards and I got tooken down, I got choked out.  I woke up and no brother and no [J.T.] and yes, I think I made a mistake."  Mancia said it was possible that he had injured his brother and that he may have had a knife, but he continued to state that he did not know where Daniel went or where he could be.  He said he did not intend to injure Daniel, he just wanted to protect himself.  Mancia also admitted he and Daniel were "more drunk" than he initially said.

11

During the interview, investigators had Mancia remove his shirt and they observed injuries to his face, arms, torso, neck, and back. Mancia also had swelling on both eyes, an orbital fracture, bruising on the left side of his neck and below his clavicles, and a bruise to his left shoulder. There were numerous scratches on his chest, back, arms, legs, and buttocks, which sheriff's deputies testified were not consistent with punching a door, or the altercation Mancia described with Daniel. Photographs taken of Mancia, which were admitted into evidence, showed small cuts and scratches on his arms, legs, chest, and back. One investigator opined that, based on his experience in the military hiking through desert terrain, it looked like many of Mancia's cuts were caused by desert brush. A physician assistant who treated Mancia after his arrest for the orbital fracture, testified that she noted in her chart at the time of treatment that Mancia "denied loss of consciousness."

An FBI special agent with expertise in analyzing cell phone data, investigated the cell phone records of Mancia the night of Daniel's disappearance and testified as an expert for the prosecution. He reviewed data from Mancia's cell phone between the hours of 8:30 p.m. and 4:00 a.m. the night of the brothers' fight, and hypothesized where the device was in relation to the location of the Mancia home and where the Corolla was found. He opined that based on his analysis, it was likely that Mancia's phone was located near where the Corolla was found around 3:00 a.m. and then near the Mancia residence around 4:20 a.m. He also testified there was no activity on the phone from around 8:30 p.m. until 3:00 a.m., which he suggested could mean the phone was powered off during that time. The agent also testified that rugged, hilly terrain can affect the accuracy of cell phone location data.

The defense also presented the testimony of an expert on cell phone data analysis. He called the prosecution's expert's analysis into question and opined there was not enough information to establish the locations of Mancia's phone during the relevant time period.

3. *Trial Court Proceedings & Sentencing*

Mancia was charged with one count of first degree murder. (Pen. Code, § 187, subd. (a).)[3] The case was brought to trial and after the prosecution concluded its case-in-chief, Mancia filed a motion to dismiss, arguing the evidence was insufficient to support the first degree murder charge. The trial court granted the motion in part, ruling that there was insufficient evidence to proceed on a theory of willful, deliberate, premeditated murder, but that the prosecution could proceed on a second degree murder charge.

During his closing statement, the prosecutor theorized that after J.T. left, Mancia murdered his brother and disposed of his body with the Jeep, then staged the Corolla to look like Daniel left on his own and rode home on his BMX bike. The prosecutor argued Mancia then fabricated a story about being choked unconscious, Daniel disappearing in that timeframe, and then waking up and leaving the house in fear. To support his theory, the prosecutor pointed to the cell phone data expert's testimony, the blood evidence, and the suspicious circumstances surrounding Daniel's disappearance and the behavior of Mancia thereafter.

In his closing, defense counsel argued the prosecution had turned a missing person case into a criminal one, emphasizing the lack of physical evidence supporting the prosecution's theory of the crime and asserting the prosecution had failed to meet its burden of proof. Mancia's defense counsel presented the alternative theory that Daniel left to cool down or because he

---

3    Subsequent undesignated statutory references are to the Penal Code.

13

felt guilty for hurting his brother, got a flat tire, wandered drunkenly into the desert, and then got lost, injured, or encountered a wild animal or criminals involved in the nearby marijuana operations.

The jury was instructed on both second degree murder and manslaughter, and also on self-defense, imperfect self-defense, provocation, heat of passion, and a special instruction on the use of force to protect personal property. After its deliberations, the jury returned a verdict convicting Mancia of second degree murder.

Before the sentencing hearing, Mancia filed a petition seeking disclosure of juror information pursuant to Code of Civil Procedure sections 206, subdivision (g), and 237. After a hearing, the trial court denied the petition. Mancia also filed a motion for new trial or modification of the verdict to voluntary manslaughter, asserting there was insufficient evidence to support the jury's verdict. The trial court denied the motion. The court sentenced Mancia to a term of 15 years to life in prison. Mancia timely appealed from the judgment of conviction.

DISCUSSION

I

*Sufficiency of the Evidence*

Mancia asserts, as he did in his motion for a new trial or modification of the verdict, that insufficient evidence supported the jury's verdict convicting him of second-degree murder. He argues that there was no evidence that he acted with malice, and at most the evidence showed that he could have killed Daniel after he was provoked, and only in self-defense.

In response, the Attorney General argues sufficient evidence supported the jury's finding that Mancia intended to kill Daniel or intended to do an act the natural and probable consequences of which were dangerous to life, and

14

that sufficient evidence supported the jury's rejection of heat of passion and imperfect self-defense theories of manslaughter.  In support of these arguments, the Attorney General points to Mancia's anger before the brothers' fight, Mancia's strength, his confession that he may have swung at Daniel with utensils or a knife, and J.T.'s testimony that she heard one of the men state, "you are bleeding" before she left the house.

The Attorney General also relies heavily on circumstantial evidence related to what may have occurred after Daniel's disappearance, including the blood found in the Jeep, Daniel not showing up for work and a planned vacation and leaving his personal belongings behind, and circumstantial evidence suggesting that Mancia disposed of Daniel's body—like the cell phone data suggesting his location near where the Corolla was found and the convenience of Mancia claiming he was unconscious.

## A

### *Standard of Review*

In assessing whether there was sufficient evidence to sustain a criminal conviction, we apply the substantial evidence standard of review. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212.)  Under that standard, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' "  (*People v. Garcia* (2020) 46 Cal.App.5th 123, 144.)  We " 'presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence[,]' " and we " 'may not substitute [our] judgment for that of the jury.' "  (*Ibid*.)  "We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency.  [Citation.]  Rather, before

we can set aside a judgment of conviction for insufficiency of the evidence, 'it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support [the jury's finding].' " (*Id*. at p. 145.)

"Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction. [Citation.] Nevertheless, 'substantial evidence,' that is, evidence that is ' " 'reasonable ..., credible, and of solid value' " ' is required, not just *any* evidence. [Citation.] In particular, a reasonable inference from the evidence ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] ... A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence.' " ' " (*People v. Sanford* (2017) 11 Cal.App.5th 84, 91–92; see also *People v. Davis* (2013) 57 Cal.4th 353, 360 (*Davis*) [" 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).)"].)

B

*Legal Standards*

"California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter. [Citation.] Murder is defined as 'the unlawful killing of a human being ... with malice aforethought' (§ 187, subd. (a)), while manslaughter is defined as 'the unlawful killing of a human being without malice' (§ 192). Thus, the 'distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice.' " (*People v. Schuller* (2023) 15 Cal.5th 237, 252 (*Schuller*).) "Malice exists when 'an unlawful homicide was committed with the "intention unlawfully to take away the life of a fellow

16

creature" (§ 188), or with awareness of the danger and a conscious disregard for life.' " (*Ibid*.)

Malice " 'is express when there is manifested a deliberate intention unlawfully to take [a life]. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.' (§ 188.)" (*People v. Bryant* (2013) 56 Cal.4th 959, 964.) " 'We have interpreted implied malice as having "both a physical and a mental component. The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.] The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and ... acts with a conscious disregard for life.' " ' " (*Id*. at p. 965.) Second degree murder is an unlawful killing with malice, but without the willfulness, premeditation, and deliberation necessary for first degree murder. (§§ 187, subd. (a), 189; *People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 697.)

"California law recognizes two circumstances where 'a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill' [citation]: (1) when a person kills ' " 'in a "sudden quarrel or heat of passion" [citation], or ... [(2) when a person] kills in "unreasonable self-defense"— the unreasonable but good faith belief in having to act in self-defense [citations].' " ' [Citation.] 'These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter "by *negating* the element of malice that otherwise inheres in such a homicide." ' " (*Schuller*, *supra*, 15 Cal.5th at p. 252.) "[I]mperfect self-defense, 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.' "

17

(*Ibid.*; see also *People v. Rios* (2000) 23 Cal.4th 450, 454 (*Rios*) ["provocation and imperfect self-defense, though they do not justify or excuse an intentional or consciously indifferent homicide, mitigate the offense by negating the murder element of malice, and thus limit the crime to manslaughter"], italics omitted.)

As Mancia asserts, the prosecution bore the burden to prove beyond a reasonable doubt that he harbored an intent to kill his brother (i.e., malice), and that if he did intend to kill, he did not do so in the heat of passion or in self-defense. "[H]eat of passion [and imperfect self-defense have] a unique legal function. Unlike most crime elements, [these theories do] not establish or increase criminal culpability, but mitigate[] an intentional, unlawful homicide, otherwise murder, to a lesser offense. For this reason, provocation [and imperfect self-defense] 'closely resemble[] an affirmative defense' on which evidence is ordinarily presented by the accused, not the People. [Citation.] Thus, far from lightening the prosecution's burden, [a] voluntary manslaughter instruction require[s] the People to prove the greater offense of murder, while ... absolv[ing the] defendant from producing evidence of provocation [or self-defense] in order to reduce the offense to manslaughter." (*Rios, supra*, 23 Cal.4th at p. 459, italics omitted.) Put more straightforwardly, to obtain a conviction for murder, the prosecution is required to establish "the absence of provocation, or of any belief in the need for self-defense, in order to establish the malice element of murder." (*Id.* at p. 454, italics omitted; see also *People v. Moye* (2009) 47 Cal.4th 537, 549 (*Moye*) [" '[N]either heat of passion nor imperfect self-defense is an element of voluntary manslaughter' that must be affirmatively proven. [Citation.] Rather, they are 'theories of partial exculpation' that reduce murder to manslaughter by negating the element of malice."].)

18

## C

### *Analysis*

The record before this court establishes the prosecution failed to meet its burden to show that Mancia intended to kill his brother. The evidence that related to Mancia's physical conduct and state of mind that night did not support the jury's determination that Mancia was guilty of second degree murder. The evidence established that J.T. woke Mancia up, that he was belligerent with her, then went into the bathroom in a fit of rage, destroying the bathroom door with his fist. According to J.T., when Daniel awoke to Mancia's frenzy, Daniel said to Mancia "I'll fuck your shit up" then "bull-rushed" him into the bathroom wall, breaking the towel rack behind Mancia.

Mancia's statements to investigators largely mirrored J.T.'s testimony. He told the lead detective that Daniel charged him, pushed him into the bathroom wall, breaking the towel rack. According to Mancia, Daniel overpowered him and his last recollection was of Daniel on top of him, choking him to the point of unconsciousness. It was undisputed that Daniel was larger than Mancia. Daniel was 6 feet 2 inches tall and weighed approximately 230 pounds. Mancia is 5 feet 11 inches tall and weighed between 175 and 180 pounds at the time of the fight. In addition, Mancia's facial injuries were consistent with his statements to detectives that Daniel had punched him repeatedly and bruises on his neck matched his report of being choked by his brother.

The most damning items of evidence of the fight were J.T.'s testimony that she heard one of the men state, "you're bleeding," and Mancia's statements that before Daniel took him to the ground he grabbed utensils, which may have included a knife, from the kitchen and used them to guard against his brother's attack. Mancia admitted he swung at Daniel with the

19

utensils, and under pressure from the detective also admitted he could have injured Daniel with the utensils before he lost consciousness. This evidence, however, does not show an intent to kill or an awareness that his conduct placed Daniel in life-threatening danger. Further, no other physical evidence corroborated the prosecution's assertion that Daniel was fatally stabbed. Likewise, while guns were found in the home, no physical evidence supported a theory that Mancia shot his brother. Put simply, there is no evidence in the record showing that Mancia intended to kill Daniel.

The Attorney General points to specific circumstantial evidence he argues shows that Mancia had the requisite mental state to be convicted of murder. The facts he identifies, however, do not support an inference that Mancia intended to kill. Specifically, the Attorney General relies on: (1) Mancia's anger with J.T. before the physical fight with his brother and his anger during the fight; (2) Mancia's "strong and formidable" physical stature; (3) Mancia's "ample opportunity to slay his brother without detection" and dispose of the body due to the six-hour window of time between J.T.'s departure and M.M.'s arrival; (4) Mancia's admission that he swung utensils (possibly a knife) at Daniel during the fight; (5) the blood on the pants found in Mancia's hamper, near the laundry room, and J.T.'s testimony that she heard one of the brothers say, "you are bleeding;" (6) the blood on the rear bumper of the Jeep and testimony from an investigator that the bumper might have been recently cleaned,[4] which, the Attorney General asserts could show a consciousness of guilt; and (7) the presence of a rifle on the property and the Mancias' neighbor's statement that he heard a gunshot.

---

[4]    An investigator testified that when the Jeep was processed for evidence he noticed that part of the bumper where the blood was located had a sheen on it, which he thought might have been from an attempt to clean blood off.

None of these facts establish an intent to kill on Mancia's part. The fact that he was angry at J.T. that day and at Daniel during the fight does not speak to Mancia's intent to kill his brother. There was no evidence that the fight concerned anything other than Mancia's belligerent actions in that moment and Daniel's anger at being awakened by Mancia. There was no evidence that the brothers harbored any animosity towards each other at all. Rather, the only evidence in the record concerning their relationship was that it was loving and friendly. The fact that Mancia lifted weights and was strong provides no insight into his mental state the night of the killing. Likewise, the fact that Mancia was alone after the killing does not speak to his mental state or what occurred after J.T. left the house. The blood evidence, J.T.'s testimony that one of the brothers said the other was bleeding, discovery of the rifle outside the house, and the neighbor hearing a gunshot also do not explain how Daniel was killed or what role Mancia may have played in the killing.

With respect to Mancia's admission to using utensils and swinging at Daniel during the fight, these statements do not show he harbored an intent to kill. As Mancia argues, this evidence at most shows that Mancia was responding to Daniel's actions and attempting to protect himself from his brother. If the jury inferred from these statements that Mancia wanted to kill Daniel, that inference was mere speculation. (See *Davis, supra*, 57 Cal.4th at p. 360 [" '[a] reasonable inference ... "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] ... A finding of fact must be an inference drawn from evidence rather than ... a mere speculation as to probabilities without evidence." ' "].) There was no motive or other evidence that would support such a factual finding. In this highly unusual situation, where there is no

21

body and no evidence concerning how the victim died, it is impossible to make the jump from Mancia's statements to investigators to the conclusion of implied malice.

The Attorney General also relies on Mancia's statements about his behavior in the six-hour time period when there were no other witnesses to the events. This evidence includes Mancia's assertion he was unconscious for several hours and then when he awoke, went outside the house and hid on the property for hours with his bike; the discrepancy between Mancia's statement that he was outside in his boxer shorts and M.M.'s testimony that he was clothed; the scratches over Mancia's body; and cell phone data the prosecution's expert opined indicated that at 3:00 a.m. Mancia's phone was near where the Corolla was found. This evidence supports a theory that Daniel was fatally injured in the fight with his brother and that Mancia disposed of the body, but it does not speak to the question of whether Mancia intended to cause Daniel's death. Because the cause of death is unknown, and there was no evidence of a motive, the only evidence of Mancia's state of

mind are his own statements and J.T.'s testimony about the portion of the fight she witnessed.[5]

The Attorney General also argues that Mancia's failure to call J.T. that night once he realized Daniel was gone and failure to ask the sheriff's deputies who came to the house the following morning for help in locating Daniel was deceitful conduct indicative of a guilty conscious. The cases the Attorney General relies on for this assertion, however, concern defendants who gave statements to authorities that they later admitted were false. (See *People v. Hughes* (2002) 27 Cal.4th 287, 335 [defendant's false statement to the authorities that he did not know the victim was evidence of his guilty conscious]; and *People v. Carrington* (2009) 47 Cal.4th 145, 188 [rejecting

---

5    The Attorney General analogizes *People v. Scott* (1959) 176 Cal.App.2d 458 to this case, and argues it supports his assertion that the jury's verdict finding Mancia harbored an intent to kill his brother was supported by the evidence. The *Scott* court affirmed a conviction for murder where the body of the victim was never discovered and the circumstances of the victim's disappearance showed she did not voluntarily leave her life behind. (*Id.* at p. 464.) The similarities between *Scott* and the present case, however, largely end there. In *Scott*, the prosecution presented a theory of intentional murder based on the testimony of tens of witnesses who provided evidence that the victim's husband murdered his wife to take her fortune. The evidence presented by the District Attorney showed that the defendant "had a motive for doing away with his wife, he coveted her large estate, attempted to prepare her friends for an explanation of her disappearance at some future time, was pleased and satisfied when she disappeared, did everything in his power to deceive her friends and the authorities in order to prevent an investigation, promptly set about through forgeries and thefts to steal her property, and fled the country when he feared that he would be charged with her murder." (*Id.* at p. 465.) In addition, physical evidence suggested that he had destroyed his wife's body in an incinerator on the couple's property. (*Id.* at pp. 471–473.) In *Scott*, overwhelming evidence supported the jury's finding that the defendant intentionally murdered his wife for her money. No similar motive or physical evidence was presented in this case to support the prosecution's theory that Mancia intended to kill his brother.

23

claim that court erred by giving jury instruction that making a willful, false statement concerning the crime at issue shows a consciousness of guilt where defendant initially denied involvement then later confessed to the crimes].) The evidence the Attorney General points to here is not the same type of deceitful conduct that alone gives rise to an inference of an intentional killing.

The Attorney General points to the facts that Daniel's disappearance was out of character and highly suspicious because Daniel's personal belongings were left at home, and he was just days from leaving for a planned vacation to Mexico with his uncles. Like the evidence concerning Mancia's behavior the night of the brothers' fight, this evidence supports the theory that Daniel did not leave on his own accord and that he may have been killed. But it provides no insight into how that killing occurred or Mancia's state of mind.

The Attorney General also argues that the evidence supported the jury's rejection of manslaughter based on either imperfect self-defense or heat of passion. This argument, however, misconstrues Mancia's challenge to the verdict and the law of murder and manslaughter. To convict Mancia of second degree murder, the prosecution had the burden to produce evidence that Mancia harbored an intent to kill Daniel and to establish the killing was not done in the heat of passion or in self-defense. (*Rios, supra*, 23 Cal.4th at p. 454.) As discussed in the prior paragraphs, no evidence presented to the jury supported these finding. Even if the jury found Mancia not credible, and rejected his version of events, there was nothing in the record that established how the death occurred or Mancia's intent to kill Daniel.

The evidence the Attorney General asserts was sufficient to support the jury's rejection of an imperfect self-defense theory of manslaughter all relates

24

to conduct that allegedly occurred after the killing.  As discussed, this evidence is silent as to Mancia's mental state and how the death occurred.  Thus, even if the jury decided Mancia's story was not plausible, there was no other evidence from which it could infer that he harbored an intent to kill his brother.  The evidence of his actions after the alleged killing took place—i.e., his statements about leaving the house afraid after he woke from the choking, not contacting authorities after he discovered his brother was gone, and the cell phone location data proffered by the prosecution's expert— suggest a consciousness of guilt, but they do not speak to whether Mancia harbored the requisite mental state to support the murder conviction.  No other evidence was presented to support this leap in logic.

The Attorney General argues that *Moye, supra*, 47 Cal.4th 537, supports affirmance of the murder conviction.  In *Moye*, the appellant was convicted of second degree murder after admitting to bludgeoning the victim to death with a baseball bat.  On appeal, Moye argued that the trial court had prejudicially erred by failing to "instruct the jury on a sudden quarrel/heat of passion theory of voluntary manslaughter." (*Id*. at pp. 540–541.)  The trial court instructed on imperfect self-defense, and the jury rejected the theory. (*Id*. at p. 548.)  After the Court of Appeal reversed, the California Supreme Court granted review and, in a divided decision, agreed with the trial court that there was not sufficient evidence to support the requested heat of passion instruction.  The defendant was the only witness to the killing, and in his telling of the events on the witness stand he was not provoked to violence by the victim's acts but only struck to defend himself from the victim's attack. (*Id*. at p. 554.)  This, in the Supreme Court's view, showed the appellant was acting with deliberation and reflection, which was contrary to the theory that he killed in the heat of passion.  (*Ibid*.)

25

The Attorney General argues "the same reasoning applies in this case," because, as in *Moye*, "the thrust of [Mancia's] version of events was that he acted in self-defense, not out of a heat of passion." This argument misconstrues Mancia's challenge to the sufficiency of the evidence and incorrectly presumes that Mancia was required to establish he was acting out of passion to negate a finding of malice. Unlike in *Moye*, Mancia does not argue his conviction was wrongful because the court did not provide instructions that would allow the jury to conclude he acted in imperfect self-defense or in the heat of passion. Rather, Mancia asserts there was *no evidence* that he intended to kill Daniel. For this reason, *Moye* is not controlling. Regardless of whether Mancia was provoked by Daniel, in this case there was no evidence to show Mancia killed his brother with malice. The fact that he admitted to swinging utensils, even a knife, during their fight does not by itself support a finding that he intended to kill. Under the only facts provided to the jury about the brothers' brawl—J.T.'s testimony and Mancia's recorded interviews with the investigators—Daniel's use of the utensils was to defend himself from Daniel's attacks.

The other case relied on by the Attorney General, *People v. Johnston* (2003) 113 Cal.App.4th 1299 (*Johnston*), also does not show the jury's malice finding was supported by the evidence presented at trial. In *Johnston*, the defendant went to his ex-girlfriend's home at 5:00 a.m. armed with a knife, and began banging on the doors, windows, and walls, demanding his ex-girlfriend come outside and threatening to kill her family. (*Id*. at p. 1304.) The ex-girlfriend's mother came outside and then her brother, who immediately engaged in a fight with the defendant. During the fight, the defendant stabbed the brother multiple times, killing him. (*Id*. at p. 1305.) After the jury convicted the defendant of second degree murder, the trial

26

court granted a defense motion under section 1181, subdivision 6, and reduced the conviction to voluntary manslaughter. The trial court found that the evidence did not support the jury's verdict because the victim started the fight by charging at the defendant. (*Johnston,* at p. 1310.)

The Court of Appeal reversed the trial court's order and reinstated the jury's verdict. (*Johnston, supra*, 113 Cal.App.4th at p. 1303.) It concluded the trial court had confused the law of heat of passion and imperfect self-defense by concluding that the stabbing was provoked by the brother's act of coming outside to fight off the defendant. (*Id*. at pp. 1313–1314.) The evidence, however, showed the defendant had provoked the fight by his actions and the court held he could not escape liability for his intentional killing based on the brother's reaction to the defendant's initial provocation. The trial court's nullification of the jury's verdict was improper because the jury had rejected the heat of passion theory and concluded that the defendant intended to kill, a finding that was supported by substantial evidence. (*Ibid*.)

Here, as discussed, and unlike in *Johnston*, there is no evidence in the record that Mancia intended to kill Daniel. Indeed, there was not even direct evidence that Daniel was killed. The Attorney General asserts that Mancia could not have acted in the heat of passion because he instigated the altercation with Daniel by raging in the family bathroom. Thus, he asserts, as in *Johnston*, Mancia was the provoker and he could not negate malice by claiming Daniel attacked him. Unlike the state of the evidence in *Johnston*, however, in this case there is *no evidence* from which the jury could have concluded that Mancia intended to kill his brother. Rather, the rage in the bathroom by J.T.'s and Mancia's accounts (the only evidence presented about those moments) was related to his belligerence towards J.T. Regardless of who provoked the fight that ensued between the brothers, the prosecution did

27

not meet its burden to show Mancia intended to harm Daniel. Critically, the burden was on the prosecution, not Mancia, to show the killing was not done in the heat of passion, in imperfect self-defense, or in the defense of property. (See *Moye, supra*, 47 Cal.4th at p. 549.) Mancia's failure to make such a showing does not dictate a finding he harbored malicious intent. (*Ibid*.)

In sum, we agree with Mancia that the prosecution did not present sufficient evidence to support the jury's finding that he intentionally killed his brother. Accordingly, the conviction for second degree murder is reduced to the lesser included offense of voluntary manslaughter.[6] (See *People v. Howard* (2002) 100 Cal.App.4th 94, 99 ["[A]n appellate court may reduce a conviction to a lesser included offense if the evidence supports the lesser included offense but not the charged offense."].)

II

*Petition for Juror Identifying Information*

Mancia contends that the trial court abused its discretion by denying his petition for juror identification information. He asserts that after trial, the jury's foreperson told defense counsel that he explained the lack of blood evidence by his belief that "because of Daniel Mancia's size he wouldn't have

---

[6]     Mancia also asserts that reversal is required because the court provided an improper jury instruction concerning the defense of property. He argues there was no evidence to support such an instruction because Daniel did not instigate the fight to protect the bathroom and its contents, rather there was only evidence that he wanted Mancia to quiet down so he could sleep. The only prejudice that Mancia contends resulted from the allegedly erroneous instruction on the defense of property was the jury's rejection of an imperfect self-defense theory of voluntary manslaughter. Because we conclude the evidence was insufficient to support the second degree murder conviction and it must be reduced to voluntary manslaughter, there is no remaining prejudice created by the special instruction for this court to address. Accordingly, we do not reach this contention.

28

bled out, but would have bled subcutaneously due to his fat, leaving no external blood." Mancia contends this information established good cause for juror identification information to determine if the foreperson provided an improper expert opinion that influenced the jury to return a guilty verdict.

The Attorney General responds that the trial court did not abuse its discretion because the juror statements relied on by Mancia are inadmissible under Evidence Code section 1150, subdivision (a), since they concern the mental process of the jury in reaching its verdict. Further, the Attorney General asserts the statements did not provide good cause for identification information because they did not demonstrate any member of the jury relied on outside evidence or expertise and not their own common experiences.

A

*Additional Background*

Following the verdict, Mancia filed a petition seeking the disclosure of juror identification information to support a motion for new trial based on alleged juror misconduct. To support the petition, Mancia's defense counsel filed declarations setting forth a conversation they had with several of the jurors after the verdict was reached. According to the declarations, the jury's foreperson told the attorneys he believed that a "larger person" like Daniel would only bleed internally or "subcutaneously" if stabbed, and this explained the lack of blood evidence. The declarations also stated that other jurors agreed with the foreperson's opinion. Defense counsel argued that this was evidence of juror misconduct because the jury improperly relied upon outside evidence in the form of the foreperson's expert opinion.

The trial court denied the petition, finding the declarations did not show good cause to release identification information because they did not contain any statement supporting the defense's assertion of juror misconduct.

The court ruled it was permissible for the jurors to rely on their common experience, knowledge, and beliefs about general matters of law and fact and that nothing in the declarations suggested that the foreperson used any extraneous source, such as specialized knowledge from a medical professional or outside research, to conclude that a stab wound might not bleed.  The trial court also pointed to Evidence Code section 1150, subdivision (a), and found the disputed statements were inadmissible because they concerned the mental processes of the jury in reaching its verdict.

## B

### *Legal Standards*

Code of Civil Procedure sections 206 and 237 govern the disclosure of juror information in a criminal trial.  After the recording of a jury's verdict in a criminal trial, the trial court must seal the "record of personal juror identifying information," including "names, addresses, and telephone numbers."  (Code Civ. Proc., § 237, subd. (a)(2).)  Code of Civil Procedure section 206 requires the court to inform jurors in a criminal action, prior to discharging them, "that they have an absolute right to discuss or not to discuss the deliberation or verdict with anyone."  (*Id*., § 206, subd. (a).)  Once jurors are discharged, the parties may discuss the deliberations or the verdict with a juror, provided the juror consents to the discussion, and the discussion takes place at a reasonable time and place.  (*Id*., subd. (b).)

A criminal defendant may "petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose."  (Code Civ. Proc., § 206, subd. (g).)  "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying

30

information." (*Id.*, § 237, subd. (b).) Good cause requires " 'a sufficient showing to support a reasonable belief that jury misconduct occurred.' " (*People v. Cook* (2015) 236 Cal.App.4th 341, 345.) " 'Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information ....' " (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.)

With respect to juror misconduct, Evidence Code section 1150 provides that "[n]o evidence is admissible to show the effect of [a] statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Thus, declarations pertaining to " ' "subjective reasoning processes of the individual juror" ' " are inadmissible to prove juror misconduct and "cannot be considered." (*People v. Danks* (2004) 32 Cal.4th 269, 301–302; see also *People v. Steele* (2002) 27 Cal.4th 1230, 1264 ["Evidence about a juror's thought process may show what that process was, but that process is irrelevant to any legal issue"].) " ' "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent." ' " (*Danks*, at p. 302.)

This court reviews a trial court's denial of a petition for the release of juror information for abuse of discretion. (*Carrasco, supra*, 163 Cal.App.4th at p. 991.)

C

*Analysis*

As the Attorney General asserts, the trial court's decision to deny Mancia's petition for juror identification information was not an abuse of its

31

discretion.  The juror statements that Mancia relies on were inadmissible under Evidence Code section 1150, subdivision (a) because they concerned the jurors' mental processes in reaching their verdict.

Further, even if the statements were admissible, they did not provide good cause for release of the information.  Specifically, as the trial court concluded, there was no indication that the foreperson relied on any specialized training or expertise to form his opinion that Daniel could have bled internally, explaining the lack of blood evidence at the Mancia home.  On appeal, Mancia asserts that the foreperson was a marine with training that could have provided specialized knowledge that was improperly relied on by the jury.  However, there is no evidence in the record to support this assertion and the trial court reasonably concluded that Mancia's allegation of juror misconduct was speculative.  Further, the trial court reasonably concluded that the jurors could reach the same conclusion about the lack of blood evidence based on their own backgrounds and experiences.  There was no abuse of discretion in the denial of Mancia's petition for juror identification information.

## DISPOSITION

The judgment is modified by reducing the conviction from second degree murder to voluntary manslaughter, and it is affirmed as modified.

The matter is remanded for resentencing for the term prescribed for the modified judgment.

McCONNELL, P. J.

WE CONCUR:

KELETY, J.

CASTILLO, J.