Filed 8/2/24  P. v. Flores CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ENRIQUE FLORES,<br><br>    Defendant and Appellant. | F086511<br><br>(Super. Ct. No. 21CR-05414)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Steven K. Slocum, Judge.

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Clara M. Levers and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Enrique Flores appeals following his conviction on two counts of attempted murder (Pen. Code,[1] §§ 187, subd. (a), 664; counts 1, 5), with the special circumstance that the crimes were premediated on both counts, an enhancement on count 1 for personally and intentionally discharging a firearm (§ 12022.53, subd. (c)), and an enhancement on count 5 for personally and intentionally discharging a firearm resulting in great bodily injury (§ 12022.53, subd. (d)); two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 2, 6), with enhancements for personally using a firearm (§ 12022.5, subd. (a)) on both counts; two counts of shooting at an occupied motor vehicle (§ 246; counts 3, 7); and one count of evading a police officer (Veh. Code, § 2800.2; count 4). Appellant also appeals the jury's findings in a bifurcated proceeding for gang enhancements (§ 186.22, subdivision (b)) on counts 1, 2, 3, 5, 6, and 7. Finally, appellant appeals the terms of his sentence, which imposed the upper terms on all nonstayed counts and several administrative assessments. For the reasons set forth below, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case develops out of a series of incidents involving appellant that begin and end with shootings and include a high-speed chase, all of which were alleged to be tied to criminal gang activities. Most relevant to the substantive issues raised on appeal are the high-speed chase and appellant's posting of a video to a social media account in which he makes various hand signals while rapping. In addition, certain sentencing decisions after appellant's convictions are also relevant. For clarity, the court will begin with a brief overview of the events that occurred but will provide more specific factual and procedural details when discussing the issues raised on appeal.

---

[1]     Undesignated statutory references are to the Penal Code.

2.

The first shooting occurred on March 25, 2021.[2] Vernon Stone, also known as Scruff, Alyssa Satawake, and their one-year-old child went to a gas station in Livingston to meet up with friends before the group planned to head to a casino. After getting gas, Stone and Satawake left briefly to get a blanket and sippy cup for their child.

After they left, a white Toyota arrived, preventing Stone and Satawake's friends from also leaving. Appellant, who was not driving and not wearing a mask, exited the Toyota with a gun and asked one of Stone's friends where he was from and where Scruff was going. After getting answers to these questions, appellant took a photo of Stone's friend and left.

A short while later, at Stone's home, a white Toyota Camry arrived, and a man wearing a mask exited the passenger's door with a gun and walked toward the vehicle Stone and his child were in. Satawake, who was not in the car, saw the man and yelled out that her baby was still in the car. Despite this, the man shot multiple times at Stone and the vehicle, and Stone fired his own weapon at the masked man. After the shooting, the shooter fled in the white car. Ultimately, 23 nine-millimeter casings were found at the scene of the shooting. Neither Stone nor his child were shot in the exchange, but a bullet was found in the headrest of the child's car seat.

On April 10, Lieutenant John Ramirez of the Livingston Police Department spotted a white Toyota Camry, with a license plate number ending in 282, backing out of a driveway on 4th Street in Livingston. Ramirez could not tell who was driving but could tell it was a male. After observing the vehicle commit a traffic violation, Ramirez attempted to stop the vehicle. Instead of stopping, the vehicle fled, traveling at a high rate of speed through residential zones and onto the freeway, eventually evading Ramirez.

The second shooting occurred on May 27. Sergio Rodriguez-Torres was driving a black Acura sedan on Main Street in Livingston when a white Toyota Camry drove

---

[2]     Subsequent references to dates are to dates in the year 2021 unless otherwise stated.

3.

alongside, and someone within started shooting. Rodriguez-Torres was shot at least twice, and his car was found to have approximately 11 bullet holes in it after the shooting. Several nine-millimeter casings and one .40-caliber Smith and Wesson unexpended bullet were found near the incident.

Police searched for the white Camry involved in the shootings and high-speed chase. On May 29, the vehicle was spotted and surveilled until it parked. Someone left the white Camry and entered a second vehicle. The second vehicle was stopped shortly thereafter, and appellant was found in the passenger seat. Appellant's cell phone and the white Camry were secured and searched. Inside the Camry, police found a nine-millimeter casing that matched those found at the scene of the May 27 shooting. GPS records showed the vehicle was in Livingston prior to the March 25 shooting, on the 1100 block of 4th Street before the April 10 high-speed chase, and in Livingston before the May 27 shooting.

With respect to appellant's cell phone, police searched both appellant's cell phone and social media records. Several relevant messages were discovered. For example, on March 20, appellant sent a message asking for nine-millimeter ammunition. On March 26, appellant sent a message saying he was hurt and later that he was "grazed by Scruff." That same day, appellant sent another message stating, "It's a graze." Additional messages sent on and around April 10 related to the high-speed chase. Even more messages and posts contained gang-related imagery or language.

Finally, in November, police recovered the firearm used in both of the shootings. The gun was located after an incident involving appellant's sister resulted in the search of a car. The serial number on the recovered gun matched the serial number visible in videos appellant posted to social media accounts that showed him holding a similar gun.

Appellant was charged in relation to both shootings and the high-speed chase in an information that also contained gang enhancement allegations. The proceedings were subsequently bifurcated such that a jury first considered whether appellant committed the

4.

charged crimes before, having found appellant guilty of those crimes, considering any related gang enhancements. Appellant was eventually convicted of all charged offenses and the gang enhancements were found true. The trial court ultimately sentenced appellant to three years plus an indeterminate term of 54 years to life, which included imposition of upper terms for those charges where the court had sentencing discretion.

This appeal timely followed.

## DISCUSSION

Appellant raises four arguments on appeal. In the first, appellant challenges his conviction on count 4, evading a police officer, arguing there was insufficient evidence to support his identification as the culprit. Appellant does not challenge any of the other substantive convictions. In appellant's second argument, he contends a video containing rap lyrics was improperly admitted during the bifurcated gang enhancement proceedings. In the third argument, appellant argues the trial court abused its discretion by imposing all upper term sentences when the statutory scheme presumed application of the low terms. Finally, in the fourth argument, appellant contends the trial court incorrectly imposed certain assessments related to counts where appellant was convicted but his sentence was stayed. We consider each argument in turn.

### *Evidence of Appellant's Identity*

Appellant challenges the guilty verdict on count 4, that appellant evaded a police officer. Appellant contends there was insufficient evidence to support the jury's conclusion that appellant was the driver of the white Camry that fled from police because the pursuing officer was not able to identify appellant as the driver. We do not agree.

*Standard of Review and Applicable Law*

A defendant claiming their conviction lacks sufficient evidence bears " 'an enormous burden.' " (*People v. Sanford* (2017) 11 Cal.App.5th 84, 91.) On such a claim, this court reviews the whole record to determine whether substantial evidence exists such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.

5.

(*Ibid.*)  Reversal is required only if it appears there is " 'no hypothesis whatever' " that sufficient substantial evidence supports the conviction.  (*Ibid.*)  That said, substantial evidence is "evidence that is ' " 'reasonable …, credible, and of solid value,' " ' " and reasonable inferences drawn from such evidence " ' " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] … A finding of fact must be an inference drawn from evidence rather than … a mere speculation as to probabilities without evidence.' " ' " (*Id.* at pp. 91–92.)

*Relevant Facts*

Lieutenant Ramirez explained that he was on the lookout for a white Toyota Camry after the March 25 shooting when he first spotted one on April 9 that had a license plate number ending in 282.  Around 11:00 a.m. the next day, he saw the same vehicle backing out of a driveway on 4th Street in Livingston.  Ramirez could not tell if there was a passenger in the vehicle but was able to tell a male was driving.

Ramirez observed as the vehicle weaved outside of its lane and then attempted to initiate a traffic stop.  The vehicle fled at a high rate of speed and, although Ramirez pursued, Ramirez eventually lost sight of the vehicle and ceased his pursuit.

Further investigation revealed the car was registered to Valeria Barrera, appellant's girlfriend, who was living on 4th Street at the time.  Barrera had purchased the car with appellant, and appellant was known to regularly drive the vehicle.  Barrera does not know how to drive and therefore did not generally use the car.

Barrera testified appellant drove her and her two sons to a park in the white Camry on April 10 to celebrate her oldest child's birthday.  She stated that appellant dropped them off at the park, left, and did not return despite their waiting for him.  She eventually got a ride home from an acquaintance and, while being driven back, received a call from the police.

Additional investigation showed that appellant's phone was utilizing a cell tower in Livingston the day of the chase, although the relevant tower was "quite a bit a ways

6.

[*sic*]" from Barrera's address on 4th Street. Testimony showed there were two cell towers that serviced Livingston, and some companies only utilized one of the two.

A review of appellant's social media accounts showed he sent a message at 3:57 p.m. on the afternoon of April 10 that read, "I need help ASAP." Later, on April 19, appellant sent a message stating, "But I was in a high speed. Took Ramirez's bitch ass on one. Had to show him quien es el que manda," which translates to, "Had to show him who's boss." A few days after that, appellant wrote, "And I didn't drive my car, loc. I went on a high speed. Has an APB on it." Additional social media images showed appellant with the white Camry in February and on April 18, thus before and after the high-speed chase.

Text messages sent from appellant's phone were also admitted. The first set of these were from Barrera to appellant and were sent around 11:00 a.m. on April 10. In those messages, Barrera asked, "Are you going to take us or not? Are you going to be a part of his birthday or not?" Appellant responded to Barrera around 5:00 p.m. the same day: "If they ask who the driver is, tell them you don't know. That's you don't know what's going on." Just before midnight that evening, appellant also asked if everything was good and texted, "What are you up to? I would pull up, but I got in a high speed. Ask Rene if he's heard the scanner." Later, on April 16 and in a different text thread, appellant texted, "[I]f you need to meet up with us somewhere tomorrow. Ramirez has been matching my house too much."

*Substantial Evidence Supports the Conviction*

Relying on the fact Ramirez could not identify the driver of the white Camry, that appellant's cell phone was marked to a tower "quite a bit a ways [*sic*]" from the scene of the chase, and a general history of mistaken identification cases, appellant contends any identification of him as the driver is mere speculation and cannot support his conviction. We do not agree.

7.

Although circumstantial, the evidence in this case is far from that which would require only speculation to conclude appellant was driving the white Camry at the time of the chase. The evidence shows appellant and Barrera shared the car, with appellant as the presumptive driver given Barrera did not know how to drive. This provided appellant with general access to the car. Barrera's testimony and the supporting text messages then show that appellant had possession of the car around the time of the chase. Ramirez's testimony provides a reasonable inference that a male was then driving the vehicle during the chase. And appellant's own text messages then confirm that he knew Ramirez had been near his home, that he had been in a high-speed chase with Ramirez, and that he was trying to hide the fact he was the driver by having Barrera claim not to know who the driver was.

These facts are quite different from those supporting the cases cited by appellant where a lack of identification warranted acquittal. For example, in *People v. Barbosa* (1967) 254 Cal.App.2d 581, the full extent of the evidence was that some unknown Latino robbed a woman and ran into a nearby building; a short time later her purse was recovered from that building after two unknown teenagers were seen attacking a third man; and even further after that the defendant was arrested in the area where the attacked man had fled and was in need of medical care consistent with having been in a fight when arrested. (*Id*. at p. 585, fn. 4.) This loosely inferential chain of events is a far cry from the present case, where the car involved in the chase was directly tied to appellant, appellant could be placed in the general area at the time, and appellant made multiple incriminating statements that included at least one fact likely known only to a person involved in the chase. Appellant's other cited case, *People v. Gibbons* (1949) 93 Cal.App.2d 28, 29–32, fares no better as that case was wholly dependent upon an in-person identification that was not only unsupported but contradicted by the victim and two other potential witnesses. Ultimately, the facts presented to the jury in this case are

substantial circumstantial evidence that appellant was the driver of the white Camry that fled Lieutenant Ramirez at around 11:00 a.m. on April 10.

### *Admitting a Video Including Rap Lyrics*

Appellant raises an issue with evidence introduced in his bifurcated trial on certain gang enhancements. Specifically, appellant argues that a video introduced in support of claims he was an active gang member was unduly prejudicial because of rap lyrics contained within the video. The People respond by arguing this issue has been forfeited, there was no error in admitting the video, and if an error is found, it was harmless.

*Standard of Review and Applicable Law*

Recently enacted Evidence Code section 352.2 provides that in "any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice under Section 352, shall consider, in addition to the factors listed in Section 352, that: (1) the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes, bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available; and (2) undue prejudice includes, but is not limited to, the possibility that the trier of fact will, in violation of Section 1101, treat the expression as evidence of the defendant's propensity for violence or general criminal disposition as well as the possibility that the evidence will explicitly or implicitly inject racial bias into the proceedings." (Evid. Code, § 352.2, subd. (a).) Additional provisions require that the court hold an in limine hearing on the admissibility of such evidence and state its ruling and reasons therefore on the record. (Evid. Code, § 352.2, subd. (d).)

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to a motion to exclude or strike the evidence that

was timely made and so stated as to make clear the specific ground of the objection or motion; and [¶] (b) The court which passes upon the effect of the error or errors is of the opinion that the admitted evidence should have been excluded on the ground stated and that the error or errors complained of resulted in a miscarriage of justice." (Evid. Code, § 353.)

We generally review a trial court's decision to admit evidence for an abuse of discretion. (*People v. Thomas* (2023) 14 Cal.5th 327, 370.)

*Relevant Facts*

Prior to the guilt phase of the trial, the court took up in limine motions. The first of these was a defense motion to bifurcate trial of the gang enhancements, which was granted. The court next ruled that direct evidence of gang affiliations could not be introduced to demonstrate appellant's intent or motive to commit the charged crimes. Following these were several rulings excluding gang-related evidence. The court regularly noted these exclusions applied to the bifurcated guilt phase portion of the trial. Notably, however, the court did rule on a motion related to gang expert testimony that would not arise until the gang enhancement trial.

After resolving all known in limine motions, the court asked if there were any unwritten motions to raise. In response, the People noted they might have some more but would need to get back to the court, and the parties made a motion to exclude witnesses, which was granted.

The court held evidentiary hearings under Evidence Code section 402 based on known objections to potential evidence in the first phase of trial and prior to opening statements. After resolving the known issues, the court took up objections that had been raised by defense counsel via e-mail regarding social media posts that may also reference gang affiliations. Counsel identified several pieces of potential evidence that he argued included gang-related evidence and should be excluded from the guilt phase. These included photographs, a greeting card, memorials, and other images purportedly offered

10.

to show certain social media accounts belonged to appellant. The court went through these potential exhibits one by one, excluding several based on significant gang imagery or relevance concerns. In many instances, the issue was resolved by a confirmation from the People that they would not introduce the evidence during the guilt phase but would offer the evidence during the bifurcated gang enhancement proceedings, or that there would be no testimony related to gang signals potentially present in the image during the guilt phase.

At the conclusion of these discussions under section 402, appellant's counsel noted, "As I'm looking through my transcripts, I see a rap song that has lyrics .… It seems very gang related .…" "I would like the jury not to hear it. It's very clearly gang related, talking about a soldier on the street. I understand the 'N' word. If that's the language the defendant used, that's the language he used, and its coming in. But it's very specifically gang related about people on the streets going to war." In response, the People stated, "I don't have a video for that for the case[-]in[-]chief," and the court confirmed, "[T]he People agree they're not playing" that video in the guilt phase. Following this ruling, the court again asked if there were "[a]ny other motions in limine," to which appellant's counsel responded, "No."

After appellant was convicted of the substantive offenses, the parties discussed the remaining proceedings that would follow. In these discussions, the People requested a jury trial on the bifurcated gang enhancements. In response, the court asked appellant's counsel directly whether there were any in limine motions needed for the gang enhancement trial. Counsel responded, "No." The court did note that it would continue to proceed under any prior in limine rulings from the guilt proceedings, "For example, a motion to exclude witnesses and et cetera," but that contrary to one of those past rulings the parties could talk about gangs and colors. Just prior to the start of the gang enhancement trial, the People affirmed with the court that they could use "photos that the

11.

Court previously excluded" and showed those photographs to appellant's counsel for review.

At the gang enhancement trial, the People introduced substantial evidence related to appellant's ties to a Norteño gang in Merced. This evidence consisted of multiple instances where appellant was contacted by police, either during a criminal investigation or in public, while associating with known gang members; an admission by appellant that he was "not a dropout"; instances where appellant was wearing gang-affiliated clothing or possessed gang-affiliated items; prior offenses involving appellant and other known gang members; gang-affiliated tattoos on appellant and his associates; and the aforementioned social media posts and photographs showing appellant with known gang members, displaying gang signs, and surrounded by gang-related paraphernalia. In one example of a social media message posted by appellant, he stated, "I've just mobbin on the leek." This statement, made just before the relevant shooting, was explained to describe a claim that appellant was riding around searching for rival gang members or other targets to kill.

The significance of this evidence was then explained to the jury by a gang expert who opined appellant had committed the crimes in this case while an active gang member and for the benefit of the gang. Within this extensive opinion testimony, the People introduced the social media video containing the rap lyrics and related social media messages into evidence. When appellant's counsel was asked if he had any objection, he responded, "No." The expert then opined that the significance of the video was that "the individual filming it is displaying an 'L' with his hand. It looks to be, like, the video is filmed inside the white Toyota Camry that I searched later as part of this case. It also appeared to be a gun on the individual's lap. [¶] And then it's clearer on the laptop than the projection, but the defendant turns the phone to himself and makes the same 'L' gesture to the camera and then puts a finger up to his lips as if to indicate, like, quiet or shhh." The related messages were significant because they showed the video was sent

"about two to three weeks before the shooting of Vernon Stone." Notably, the same "L" gesture was then identified in following videos also introduced into evidence. The lyrics contained in the video were not discussed by the witness.

*Appellant has Forfeited this Argument*

" ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 590.) "Whether an evidentiary objection is preserved for review by a pretrial motion is determined by the precise subject matter of the in limine motion and ruling." (*People v. Rouston* (2024) 99 Cal.App.5th 997, 1013.) A pretrial motion may be insufficient to preserve an evidentiary objection because actual testimony " 'sometimes defies pretrial predictions' " and events " 'may change the context in which evidence is offered to an extent that a renewed objection is necessary to satisfy the language and purpose of Evidence Code section 353.' " (*Ibid.*)

In this case, appellant's counsel objected prior to a bifurcated guilt phase trial that potential evidence contained substantial references to gang affiliation that could prejudice a jury. In response, the People confirmed they would not offer the evidence in the guilt phase. Appellant's counsel was provided with a separate opportunity to raise issues with respect to evidence for the gang enhancement phase and did not renew the objection. Further, when the evidence was actually offered at the gang enhancement phase, counsel was specifically asked if there were any objections, and he responded, "No." As the relevance of the evidence substantially changed between the guilt and gang enhancement phases, the preguilt phase in limine motion based on relevance and gang affiliation prejudice was insufficient to preserve an argument that the evidence was irrelevant and overly prejudicial in the gang enhancement phase, even in light of Evidence Code

13.

section 352.2. Accordingly, appellant's failure to raise the issue during the gang enhancement phase forfeited any claim of error on appeal.

*Any Error was Harmless*

The court notes, however, that even if an allegation of error were preserved, and an error found in this case, appellant cannot show that error was prejudicial. A "state law error in admitting evidence is subject to the traditional *Watson*[3] test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The video evidence contested in this case is one piece in a large collection of evidence supporting appellant's gang affiliation. Notably, appellant does not challenge the evidence supporting the gang enhancement findings generally, only the effect of introducing this particular piece of evidence. In this case, the video contested supports a claim that appellant was an active gang member at or around the time of the shootings. Additional support for this position was introduced through a multitude of other social media posts made at or around the time of the shootings, admissions by appellant, past conduct associating with gang members, the presence of specific gang affiliated tattoos, and the presence of gang-affiliated clothing—none of which is challenged by appellant. Moreover, there was no focus in the proceedings placed upon the lyrics of the video. Rather, appellant's actual conduct in the video, flashing a purported gang sign and possessing a gun while in the car used in the relevant crimes, was the only point discussed—and then only briefly. Upon an overall review of the record, even if the trial court could be said to have erred in admitting a video containing inflammatory lyrics, there is no reasonable possibility the verdict would have been more favorable to appellant if the video was excluded.

---

**3**      (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## *Imposing Upper Terms at Sentencing*

Appellant's sentence in this case is partially based on the trial court's determination that the upper term of the sentencing range was appropriate for all charges. On appeal, appellant contends the trial court abused its discretion when it determined that appellant qualified for presumptive low terms but that this presumption was overcome by the aggravating factors of the crimes.

*Standard of Review and Applicable Law*

The court's sentencing process is governed in part by section 1170. With respect to determinate sentence ranges, "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).) The court may impose a sentence "exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term" and those facts have been stipulated to or found true beyond a reasonable doubt. (§ 1170, subd. (b)(2).)

Further, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:" (1) psychological, physical, or childhood trauma; (2) youth at the time of the offense; or (3) intimate partner violence or human trafficking victimization. (§ 1170, subd. (b)(6).)

In imposing a sentence, the trial court "may not impose an upper term by using the fact of any enhancement upon which sentence is imposed." (§ 1170, subd. (b)(5).) " 'Improper dual use of the same fact for imposition of both an upper term and a consecutive term or other enhancement does not necessitate resentencing if "[i]t is not reasonably probable that a more favorable sentence would have been imposed in the absence of the error." ' " (*People v. Osband* (1996) 13 Cal.4th 622, 728.) "Only a single

15.

aggravating factor is required to impose the upper term .…" (*Ibid.*) The trial court's sentence is ultimately reviewed under the abuse of discretion standard. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)

*The Court's Ruling*

The parties do not dispute that the trial court found appellant qualified for the presumptive low term based at least on the fact that prior trauma was a contributing factor to the offenses. Rather, the issue as raised by appellant is whether the trial court properly identified the aggravating factors and acted within its discretion in determining those factors outweighed the presumptive lower term sentence and the mitigating factors in the case.

The trial court discussed in detail its thinking throughout the sentencing proceedings, including why it imposed the upper term. In its tentative ruling, the court first noted that while it had discretion as to which crimes would constitute the primary offenses, it would impose sentence on the attempted murder charges, while staying lesser offenses. The court next concluded probation was not proper because appellant was presumptively ineligible and could not demonstrate this was an unusual case where the interest of justice would best be served by probation. Following this, the court explained it would impose consecutive and concurrent sentences and why it would not dismiss any charges or enhancements. The court determined dismissal would endanger public safety and would not further justice, specifically finding, "[T]here is a likelihood that the dismissal of the gang and firearm enhancements would result in physical injury and serious danger to society."

The court then proceeded to its tentative sentencing. In discussing the determinate and indeterminate sentences, the court stated it was applying the upper term when relevant. The court provided a detailed discussion of this choice: "I have considered Penal Code Section 1170[ subdivision,] (b) (6) (B)[,] which provides for a presumptive low term because [appellant] was 22 years of age at the time he committed these

16.

offenses," and "I have also considered Section 1170 [subdivision ](b) (6) (A) with the presumptive low term for a person who has experienced psychological, physical, or childhood trauma." The court determined it could not find appellant also suffered from a mental disorder because the doctor reporting on the condition had expressly noted there were no supporting documents for such a diagnosis and the doctor could only recount what she was told by appellant's family.

The court then explained its sentencing choices. First, the court provided an overview, finding that "the aggravating circumstances outweigh the mitigating circumstances," "that imposition of the lower term would be contrary to the interest of justice because it would jeopardize public safety," and there was no "basis to conclude that [appellant]'s age was a contributing factor in the commission of the crimes."

Next, the court reviewed mitigation factors identified in California Rules of Court, rule 4.423(b)[4] that it believed were applicable to the case and stated: Appellant "experienced childhood trauma, and it was a factor in the commission of the crime" under rule 4.423(b)(3); appellant "was under 26 years of age at the time of the commission of the offense" under rule 4.423(b)(6); "application of an enhancement could result in a sentence over 20 years" under rule 4.423(b)(10); and "multiple enhancements are alleged in the single case" under rule 4.423(b)(11).

After recognizing these mitigating factors, the court turned to aggravating factors. As appellant agreed to a court trial on these factors, the court ruled that the "factors in aggravation under Rule 4.421 that I find beyond a reasonable doubt to be true are as follows:

"[Rule 4.421](a) (1) applies to Counts 1 through 3 and 5 through 7. These crimes involved great violence, the threat of great bodily harm, and acts disclosing a high degree of viciousness or callousness.

---

[4] Further references to rules are to the California Rules of Court.

17.

"With respect to the March 25th, 2021, shooting, Ms. Satawake screamed at [appellant], yelling that her baby was inside the [vehicle]. She pled with him not to shoot her child. [Appellant] ignored Satawake and fired approximately 16 times at Stone as he was seated in the driver's seat of the [vehicle]. Two rounds struck—two rounds of ammunition struck the baby seat's headrest where the child was seated. But for the grace of God, Satawake's child could have been struck in the head by gunfire and killed.

"Furthermore, [appellant] was shooting a vehicle parked in a small cul-de-sac with people's home as his backstop. The shooting was committed during daylight hours when innocent bystanders could have been harmed. These facts strike me as being particularly callous. The same holds [true] for the second shooting on Main Street where people's homes were located.

"All right. Next, I find beyond a reasonable doubt that [rule 4.421](a) (2) applies. As for the shooting on March 25th, 2021, at Stone—sorry. That's—yes—at Stone, the manner in which the crime was carried out indicates planning. In his social media posts, [appellant] bragged that he had been 'mobbing' which is the equivalent of hunting for people to kill by gang members. [Appellant] had prepared himself for the shooting by arming himself with a [nine-]millimeter handgun and a high-capacity magazine. [Appellant] was looking for Stone. [Appellant] asked … for [Stone's] location at the gas station. [Appellant] and an unknown driver then drove from [the] gas station to find Stone. [Appellant]'s driver executed a U-turn to block the cul-de-sac and allow better access for [appellant] to quickly exit the vehicle to approach and shoot Stone. These facts indicate [appellant] was planning to kill Stone.

"Next, I find beyond a reasonable doubt that [rule 4.421](b) (1) applies. [Appellant] engaged in violent conduct that indicates a serious danger to society. Two shootings on two different dates in residential neighborhoods utilizing a high-capacity magazine demonstrates violent conduct constituting a serious danger to the residents of Livingston.

18.

"Next, I find beyond a reasonable doubt that [rule 4.421](b) (2) applies. [Appellant]'s prior convictions are of an increasing seriousness. [Appellant] had already been convicted twice for unlawfully possession—unlawful possession of firearms when he committed these shootings.· The maximum term for those offenses was 3 years. The current crimes, with the exception of Count 4, carry higher triads or indeterminate terms in state prison, which means they're more serious.

"Next, I find beyond a reasonable doubt that [rule 4.421](b) (4) applies. [Appellant] was on two grants of felony probation when the crimes were committed in this case, Cases 17CR-05891A and 18CR-02022.

"Finally, I find beyond a reasonable doubt that [rule 4.421](b) (5) applies. [Appellant]'s prior performance on probation was unsatisfactory. [Appellant] was convicted of unlawful possession of a firearm on November 27th, 2017. He was placed on probation for three years. Six months later, [appellant] was convicted of possession of a loaded firearm. Furthermore, [appellant] had already violated the terms of his probation four times in Case -891A and three times in Case -022 at the time of this shooting."

The court then concluded by stating it found "that the aggravating factors outweigh the mitigating factors and that the upper terms are appropriate in the case."

*The Trial Court Did Not Abuse Its Discretion*

Appellant's arguments briefly raise several purported issues with the trial court's analysis. These include an assertion that the upper term was not warranted because the crimes were not distinctively worse than ordinary gang shootings, an assertion that the "fact the crimes were increasing in seriousness revealed appellant did not have a significant prior record," a claim that the use of a firearm could not support the upper terms for any counts because it was an element of the crimes, and an assertion that the

high-speed chase did not create a "greater than average risk to the public since violating traffic rules necessarily carries a risk of danger to the public."[5]

Appellant's arguments are not persuasive. The trial court provided substantial detail regarding its discretionary determination that the factors found in aggravation outweighed those found in mitigation. Unlike *People v. Moreno* (1982) 128 Cal.App.3d 103, 110, cited by appellant, where the court improperly determined use of a knife to commit a violent felony was sufficient to support the upper term, the court's decision in this case focused on a wide array of facts related to the offenses, including substantial planning, the presence of highly vulnerable victims, and the public nature of the offenses to support its findings. Nothing in the court's reasoning suggests it improperly relied on the existence of the crime itself or the mere use of a firearm to support its conclusions. Nor does it suggest the court was unaware of or improperly failed to consider factors in mitigation. Rather, the court looked at the totality of the circumstances, identified aspects of the crimes that were particularly concerning to public safety or to the callousness of the offenses, and weighed those circumstances against the mitigating factors and in the context of the relevant analysis. In light of the substantial factors present in the record and identified by the trial court that supported its imposition of the upper terms, we find no abuse of discretion in its sentencing decision.

Moreover, even if we were to find an error in the court's determination of one aggravating factor or another, the court's overall analysis, including its consistent

---

[5] In a one-sentence claim with a single citation, appellant also contends the trial court wrongly determined appellant did not suffer from bipolar disorder because it failed to credit statements made by his family to the doctor reviewing his case. We see no merit in this claim, as the trial court acknowledged the statements but discounted them in light of a lack of documentation and uncertain factual support expressly noted by the doctor reviewing the records. While lay opinion testimony is permissible to prove certain facts, the court was under no obligation to give meaningful weight to statements providing generally unsupported medical diagnosis claims. (See *In re Handa* (1985) 166 Cal.App.3d 966, 973 [factors in mitigation may be disputable because they are not established by the evidence].)

20.

determination that the nature of the crimes warranted the strongest of penalties within the court's discretion, demonstrates that any error would be harmless in this case. (See *People v. Moreno, supra*, 128 Cal.App.3d at p. 110 [error harmless where judge identified numerous other permissible aggravating factors making it not reasonably probable that absent the error a different base term would have been selected].)

## *Imposing Assessments on Stayed Counts*

In this case, assessments were imposed on counts 2, 3, 6, and 7, despite the sentences for those counts being stayed under Penal Code section 664. Appellant contends that the $30 criminal conviction assessments (Gov. Code, § 70373) and $40 court operations assessments (Pen. Code, § 1465.8) imposed on the stayed counts should not have been imposed or should be stayed.

Appellant recognizes that the case law in this area does not support his claim. As appellant concedes, *People v. Sencion* (2012) 211 Cal.App.4th 480, 483 and *People v. Crittle* (2007) 154 Cal.App.4th 368, 370 both hold that trial courts are required to impose certain assessments even though the underlying sentences have been stayed. Appellant contends, however, that we should reexamine these conclusions in light of *People v. Son* (2020) 49 Cal.App.5th 565, 595–596, which holds that certain assessments may not be imposed on a defendant that is unable to pay. Notably, appellant does not contend that he is unable to pay the assessments, nor does appellant explain what aspects of *Son* compel a finding that court fees historically not deemed to be punishment should now be reconsidered as such.

This court declines appellant's invitation to reconsider *Sencion* or *Crittle*. As the criminal conviction and court operations assessments do not qualify as punishment, they were required to be and were properly imposed. (See *People v. Crittle*, *supra*, 154 Cal.App.4th at p. 370 [section 654 "does not apply to a court security fee because that fee is not punishment"].)

**DISPOSITION**

The judgment is affirmed.

HILL, P. J.

WE CONCUR:

POOCHIGIAN, J.

FRANSON, J.