Filed 4/21/17 (received for posting on 4/24/17)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JACOBI SANFORD,<br><br>     Defendant and Appellant. | A145156<br><br>(Solano County<br>Super. Ct. No. FCR295910) |

Defendant Jacobi Sanford was convicted of second degree robbery and sentenced to four years in prison after a group of men, reported by witnesses to be African-American, robbed a jewelry store and escaped in two cars.[1] By the time the police located one of the cars approximately 10 minutes after the robbery, Sanford, who is African-American, was a passenger in it. Otherwise, no physical evidence linked him to the robbery, no witnesses were able to identify him, and other, uncontroverted evidence indicated that at least one of the car's occupants had changed between the time of the robbery and the location of the car by the police. As we shall explain, the crucial inference that Sanford was necessarily at the scene of the robbery because he was in the car when it was stopped is therefore speculative. Under these unusual circumstances, we conclude that insufficient evidence supports the conviction and reverse.[2]

---

[1] Sanford was convicted of second degree robbery under Penal Code section 211, resulting in a prison term of three years. The jury also found true the allegation that a principal was armed with a firearm under Penal Code section 12022, subdivision (a), resulting in a prison term of one year.

[2] As a result, we need not reach Sanford's other claims on appeal.

1

A.  *The Robbery.*

1.  Eyewitness accounts.

On the morning of August 30, 2012, Louis D. was working at his jewelry store, which is on the south side of Main Street west of its intersection with Davis Street in downtown Vacaville. He testified that while he was alone in the store around 11:00 a.m., several people ran through the front door. The first man, who was wearing a gray hooded sweatshirt with the hood pulled up and "a mask . . . that looked like [one] from the movie 'Scream,' " ran forward and held a black handgun within four or five inches of Louis D.'s face. Louis D. testified that he counted five other men who then entered the store and started using hammers to smash the display cases, leaving shattered glass all over the store.[3] These five people had dark-colored bandannas with "white swirl[s]" partially covering their faces and were wearing gloves, some "dark" and some "[r]egular gray." They also had on, variously, gray and navy hooded sweatshirts with the hoods pulled up. Louis D. testified that all six were African-American, although he admitted on cross-examination that one of the men "could have been a Hispanic male."

Louis D. testified that as the gunman asked where his video setup and safe were, four of the other robbers were grabbing jewelry from the smashed display cases and putting it into bags they all carried. Louis D. saw several "large gym bags," at least one of which was navy, and one "large red bag . . . like . . . a carpenter's bag." The remaining person ran toward the store's back room, where the safe was located.

The gunman ordered Louis D. to lie down, and Louis D. complied, resting one side of his face on the ground so that he was looking toward the display cases. From this angle, he observed that the gunman was wearing black or navy shoes and dark denim pants. Louis D. also saw the other robbers' pants, which were also "dark-colored jeans,

---

[3] Louis D. acknowledged on cross-examination that it was possible there were only five people total who came into the store, not six.

navy and black for the most part," and shoes, which were dark-colored "tennis shoes, Converse or whatever" except for one pair of "red shoes."

Louis D. testified that about 60 to 90 seconds after the people entered his store, they left together through the front door.[4] After they ran outside, "they kind of veered slightly to the right," in the direction of the salon next door to the east, toward Davis. He also saw two vehicles, one green and one black, next to each other slightly east of his storefront, but he did not see anyone get into either vehicle.

Louis D. got up about 10 seconds after the people left and called 911. He then went to the back of the store and checked his safe, which he had left unlocked that day, and noticed that some bins of jewelry and his daughter's Social Security card were missing from it. He also noticed blood near one of the display cases and on the floor of the back room.

Other eyewitnesses testified about the morning of the robbery, including Erica W. and her mother, Kathy P., who were working at the salon next door to the jewelry store. As Erica W. was standing at the front window waiting for clients to arrive, she saw a black Dodge Magnum illegally parallel park across two angled parking stalls in front of the salon. She then saw six people wearing masks (the majority of which were "Scream" masks), "black sweatshirts with hoods," and "dark blue jeans" emerge from both rear doors of the Magnum and walk into the jewelry store while the driver stayed inside the car. She could not see the six people's hands, which were in their pockets, or their faces, and she could not tell what race they were.

Erica W. testified that the driver began "honking the horn just a few seconds after" the other people had entered the jewelry store. She relayed the Magnum's full license plate number to Kathy P., who wrote it down and called 911. About two minutes after they exited the Magnum, Erica W. saw the same people exit the jewelry store and several of them get into the car through both rear doors. She noticed that one was wearing a pair

---

[4] Louis D. testified that he did not notice anyone leave through the back door, which led to an alley to the south with an eastern entrance on Davis. The back door was locked from the inside, and opening the deadbolt would have required a key.

3

of red sneakers, which "stuck out like a sore thumb." One person did not fit into the back and "couldn't get in . . . fast enough" before the Magnum drove away, and Erica W. saw him run down Main and get into the Magnum's front passenger seat as the car was turning right onto Davis.

Kathy P. testified that she saw "like six guys" get out of the Magnum's passenger side and hurry toward the jewelry store. They were wearing dark pants and dark hooded sweatshirts, and Kathy P. "thought they looked like . . . [n]injas . . . because you know how they wrap their faces and heads and stuff." The men "all had something shiny in their hands," which were raised in the air. She could not see their faces because they were looking down. Kathy P. heard the driver begin honking, and the six other individuals, one of whom was carrying something red that "looked like a soft-sided ice chest," ran out of the jewelry store and "started piling into the car." Kathy P. also saw one person fail to get in the Magnum before it drove away and then run down the sidewalk.

The final eyewitnesses to testify were Claudia H. and her friend, Victoria D. They were driving down Main toward Davis around 11:00 a.m. on the morning of the robbery. Claudia H., who was the passenger, noticed "a Dodge Magnum parked, blocking the traffic." She testified that she saw two or three "men wearing black," one of whom was carrying a black handgun, emerge from both doors on the passenger side of the Magnum and enter the jewelry store.[5] She did not see if the other person or people were carrying anything because she was focused on the gun. She testified that she could not see the men's full faces because they were "wearing . . . handkerchiefs," but she thought they were African-American, based on the color of their hands and parts of their faces that were showing, and the man with the gun had dreadlocks and was wearing a distinctive belt.

Victoria D. testified that she noticed "about five men" wearing "black hooded sweatshirts," whose faces she could not see, get out of both of the Magnum's passenger-

---

[5] In a police interview shortly after the incident, Claudia H. reported that she saw four men run toward the jewelry store.

4

side doors and run into the jewelry store.[6] Some of the men had hammers, and one had a silver gun. She had a better view of the driver, whose face was not covered, and she described him as African-American and "heavy[]set." This testimony was the only evidence presented of the identity of the person driving the Magnum at the time of the robbery.

Eventually, the Magnum moved out of the way, and Victoria D. continued down Main and turned right on Davis. As Victoria D. drove by the entrance to the alley behind the jewelry store, Claudia H. noticed a black Dodge Charger parked in the alley, facing away from Davis. Claudia H. testified that "the driver's side [was] open" and a "person [who] was standing outside the vehicle [was] wearing the exact same thing . . . [as] the people [who] went into the jewelry store with the handgun." Claudia H. was unable to get the Charger's license plate number, and Victoria D. quickly drove around the corner so they could try again. By the time they were in sight of the alley again, less than a minute later, the Charger was gone.

2. The city video recording.

A recording from a city video camera located in a park northeast of the jewelry store with a distant view of the corner of Main and Davis and the alley entrance was played for the jury. The recording, which we have reviewed, shows what appears to be the Charger turn onto Davis from Main and then make a right turn westward into the alley and pull out of sight. The Charger must have turned around in the alley because about 45 seconds later it pulls back into view at the alley entrance, now facing east toward Davis. A few seconds later, it reverses back into the alley, out of sight.

Immediately after the Charger disappears back into the alley, a person rounds the corner from Main and runs down the sidewalk on Davis and turns into the alley. Steps behind that person is another person who also runs down the Davis sidewalk and turns into the alley. As the second person reaches the alley, what appears to be the Magnum quickly rounds the corner from Main and drives away south on Davis. As it does so, it

---

[6] Soon after the incident, Victoria D. reported to the police that she saw three to four people run toward the jewelry store.

5

passes two other people who then also run down the Davis sidewalk and turn into the alley. The Charger immediately pulls out of the alley and drives away south on Davis, about 10 seconds behind the Magnum. Although the recording is not of sufficient quality to show whether the four people who entered the alley actually got into the Charger, it is a fair inference that, as a Vacaville police officer testified, all four people got into that car. The recording does not show anyone enter the Magnum.

B.      *The Magnum and Its Occupants.*

A different Vacaville police officer testified that he heard the radio call about the robbery at the jewelry store at 10:59 a.m. and arrived at the scene a few minutes later. Kathy P. approached the officer and provided him with a description of the Magnum and the license plate number she had written down, and he broadcast the information. At 11:01 a.m., another Vacaville police officer heard the dispatch, and he "began circling the area" to see if he could locate the Magnum. About five minutes later, after he learned that the Magnum's "plate possibly came out of the Antioch . . . [a]rea," he drove onto westbound Interstate 80. At about 11:10 a.m., approximately five to six miles from the jewelry store, he saw a black Magnum with the reported license plate number driving in the rightmost lane at 60 to 65 miles per hour.[7] The Magnum's driver did not attempt to evade him, and there was no chase. The officer followed the car until multiple law-enforcement agencies responded and it was stopped around 11:20 a.m., approximately 10 to 12 miles from Vacaville.

The Magnum had three occupants, all African-American: two adults, Adrian Landers, the driver, and Derrick McCann, the front passenger; and 16-year-old Sanford, who exited from the rear door on the driver's side. According to a Vacaville police officer who was present for the stop, McCann was wearing a "white T-shirt, dark colored jeans," and "grayish blue Nike[s] with a red Nike swoosh on [them]." Sanford was wearing "very dark colored jeans, a black T-shirt," a reddish-orange Miami Dolphins

---

[7] The evidence showed that there were two entrances to westbound Interstate 80 within a block or so of the alley.

6

baseball cap, and gray sneakers.[8]  None of the three had dreadlocks.  All three complied with officers' orders, and Sanford was noted to have a "good" demeanor.

The police eventually transported all the eyewitnesses except Kathy P. to an area near where the Magnum was stopped to see if they could identify the Magnum's occupants.  Louis D. testified that he did not recognize the faces of the three people but that they were wearing dark pants and shoes as were the people who robbed his store.  At trial, he did not recall whether any of the three was wearing the red shoes he had previously seen.  Erica W. was unable to identify anyone, although she identified the Magnum and testified that one of the people was "wearing the pair of red shoes that [she] saw earlier."  Claudia H. was also unable to identify anyone, but she said one of the three was wearing a belt like she had seen the gunman wearing.[9]  Finally, Victoria D. identified the Magnum as the car she saw in front of the jewelry store, but she did not recognize any of the three people, none of whom was the man she saw in the Magnum's driver's seat at the scene of the robbery.

The Magnum is a hatchback, and the hatch area is accessible by a passenger in the back seat.  Police recovered from this area a "very dark blue" hooded sweatshirt with "dingy white" gloves in its front pocket and an empty black canvas bag with a red stripe and red on the straps.[10]  A black do-rag was found in the front-passenger-door panel.[11]

Small bits of broken glass, about the size of a grain of rice and consistent in size with some of the broken glass at the jewelry store, were found in four areas of the

---

[8] There was no testimony about Landers's clothes.  A recording of the stop made by a CHP helicopter camera, which was played for the jury, shows that Landers was wearing a bright blue short-sleeved shirt with white collar and cuffs, blue jeans with a belt, and light-colored sneakers.

[9] It is not apparent from the record which of the Magnum's occupants was wearing the belt Claudia H. recognized.

[10] Later that day, while McCann was at the police department, he asked for the sweatshirt and said it could be found in the back of the Magnum.

[11] The do-rag was described as "a nylon polyester scarf that had . . . long strips on it, . . . a scarf that goes over your head and then you can pull the straps back to tie in the back."

Magnum: one near the front-passenger-door handle, one under the brake pedal, one near the driver's door frame, and one in a front pocket of the hooded sweatshirt from the hatch. There was no glass found in the back seat area where Sanford was sitting.

No guns, hammers, or other weapons were recovered from the Magnum. No bandannas matching the witnesses' descriptions or masks were found. No jewelry and no Social Security card were discovered. There was no blood in the Magnum, and none of its three occupants, including Sanford, appeared to be cut or bleeding. The parties stipulated that none of the 17 fingerprints collected from the Magnum were Sanford's and that DNA testing of the blood found in the jewelry store showed that the blood was not Sanford's, Landers's, or McCann's.

## II.
### DISCUSSION

*A.*      *Standard of Review.*

To evaluate a claim that a conviction lacks sufficient evidence, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Our focus " 'is on the *whole* record of evidence presented to the trier of fact, rather than on " 'isolated bits of evidence.' " ' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1329.) " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " (*In re George T.* (2004) 33 Cal.4th 620, 631.) Instead, reversal is required only if " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

Given this deferential standard of review, a "defendant bears an enormous burden in claiming there is insufficient evidence" to support a conviction. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.) Nevertheless, "substantial evidence," that is, evidence that is " ' "reasonable . . ., credible, and of solid value" ' " is required, not just *any* evidence. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1363.) In particular, a reasonable inference from the evidence " ' "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guesswork. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

B.      *Sanford's Conviction Lacks Substantial Evidence.*

Sanford does not contest that a robbery occurred or that "several men were responsible for it." Instead, he claims there was insufficient evidence that he was one of the men present at the robbery scene or that he otherwise aided and abetted the crime. We agree that the determinative issue is whether Sanford was one of the suspects at the scene of the robbery, as the Attorney General does not propose, and we cannot perceive, any theory supported by substantial evidence under which Sanford would be guilty if he had not been at the scene.

Almost no evidence was presented to establish that Sanford was there. To begin with, no physical evidence tied Sanford to the jewelry store. The DNA recovered from the store was not his. The shards of glass in the Magnum, while perhaps showing that someone in the car had been inside the store, were not found near Sanford or any of his belongings. No jewelry, guns, hammers, masks, or bandannas were found in the Magnum, much less in Sanford's possession, and McCann claimed ownership of the dark hooded sweatshirt with gloves in the pocket, the only items of clothing found in the car that conceivably matched the witnesses' descriptions of what the robbers were wearing. No evidence was presented to show that Sanford was wearing either of the more distinctive clothing items identified by witnesses, the red sneakers or the belt. Nor was there any evidence of flight or other conduct by Sanford suggesting guilt.

9

The only two pieces of evidence indicating that Sanford might have been one of the men at the robbery scene were the fact that he was in the Magnum when it was pulled over and the testimony of the witnesses that the participants in the robbery at the jewelry store were African-American men wearing dark-colored jeans and shoes. In our view, being in a getaway car shortly after a crime and having some of the same general characteristics as the perpetrators will likely be substantial evidence of identity in cases where it is reasonable to infer that the occupants of the getaway car were unchanged. But it is not substantial evidence in cases, such as this one, where it is not reasonable to make such an inference.

Sanford relies on *In re David K.* (1978) 79 Cal.App.3d 992 (*David K.*), which also involved the sufficiency of the evidence to establish identity. In *David K.*, three people approached the victim in San Francisco, one of them robbed the victim of money at knifepoint, and the three drove away from the scene in the victim's car. (*Id.* at p. 997.) "Approximately three hours later," a police officer in Yuba City stopped the car and found three people inside: one driving, one in the front passenger's seat, and the minor, who was sitting in the back seat with several items that were in the car when it was stolen. (*Ibid.*) The victim identified the front-seat passenger as the person who had robbed him, and a switchblade knife was found under that person's seat, but the victim was unable to identify the minor or the driver. (*Ibid.*) At the jurisdictional hearing, the victim "admitted that, shortly after the robbery, he told a police officer that all three of the individuals . . . were of Latin descent and that all three of the individuals were 25 to 26 years of age." (*Ibid.*) Two of the three people found in the car were "of Latin descent," but the minor was "a Caucasian," and all three were teenagers. (*Id.* at pp. 997-998.) The juvenile court found that the minor had aided and abetted the robbery. (*Id.* at p. 996.)

The Court of Appeal reversed, holding that there was insufficient evidence that the minor was one of the two people who left in the victim's car with the perpetrator of the robbery. (*David K., supra*, 79 Cal.App.3d at pp. 1000-1001.) The court explained that "[t]he only evidence to connect the minor David with the robbery . . . [was] the fact that

10

three hours after the robbery, in a city some distance from the site of the robbery, David was found in the company of the identified robber in the stolen automobile with personal property of the victim being found in open view in the automobile. No cash proceeds of the robbery were found on David's person," and there was no evidence that he "was exercising any dominion or control over" the stolen articles in the back seat. (*Id.* at p. 1000.) The court determined that "[t]o draw an inference from these facts that David was one of the three persons at the site of the robbery three hours earlier in another city would amount to pure speculation." (*Ibid.*) The court also noted that the victim could not identify the minor and had described all three suspects as being "of Latin descent and . . . young adults," a description that fit the minor "[b]y no stretch of the imagination." (*Ibid.*)

*David K., supra*, 79 Cal.App.3d 992, is distinguishable from this case mainly because of the longer period of time that passed between the robbery and the detection of the getaway car. *David K.* implies that the passage of enough time makes it unreasonable to infer that the people who got into a car are necessarily the same as those found in it when it is later stopped. In most cases, we would likely agree with the Attorney General that 10 minutes is a short enough period of time to reasonably infer that the car's occupants are the same.

But the particular circumstances in this case preclude such an inference. True enough, substantial evidence supports the premise that there were three people in the Magnum when it left the scene. Although the evidence presented about the number of robbery participants was inconsistent, substantial evidence indicated that a total of eight suspects were at the scene: some witnesses identified six people entering the store, and both cars had a driver. And the video recording suggests that five people, the driver and the four people who ran into the alley, left the scene in the Charger.

The problem, however, is that other, uncontroverted evidence undermines the reasonableness of inferring that the three people who were in the Magnum when it left the robbery scene were the same three who were found in it. This evidence included unchallenged testimony indicating that, at the very least, the driver changed. Victoria D.

11

saw the original driver's face at the scene, but she could not identify Landers, McCann, or Sanford after they were found in the car. She also described the driver at the scene as heavyset, but she testified that "there was no large, heavy[]set Black man" present when she was asked to identify the Magnum's occupants, and the CHP video recording taken when the car was pulled over confirms that none of the three came close to fitting such a description. The absence of jewelry, weapons, and disguises in the Magnum further suggests that the car stopped for some reason between the scene and the freeway. The prosecutor accepted this probability and in closing remarks specifically told the jury that it could "make a reasonable inference from all the facts" that "there was a switch" between the Charger and the Magnum at some point after the cars left the scene but before the Magnum got on the freeway. It is not reasonable to conclude based on the evidence presented that the Magnum got on the freeway without first making a stop during which the composition of the car's occupants changed to at least some extent.

The Attorney General may be correct in pointing out that *David K., supra*, 79 Cal.App.3d 992, is distinguishable because "David K. had a much greater opportunity to enter the car after the robbery than did [Sanford]" given the three-hour passage of time. But although here the period of time was far shorter, the evidence presented, unlike the evidence in *David K.*, established not just an opportunity for the car's passengers to have changed but also the occurrence of an actual event during which the car stopped, a switch of at least one occupant took place, and physical evidence of the crime was purged. Under these circumstances, it is not reasonable to infer that the occupants of the car when it was pulled over were the same as they were at robbery scene. Since no other evidence links Sanford to the scene, any conclusion that he was there is necessarily speculative and not based on substantial evidence.

Although we recognize our duty to "view the evidence 'in the light most favorable to the prosecution' [citation] . . . [, a] formulation of the substantial evidence rule which stresses the importance of isolated evidence supporting the judgment . . . risks misleading the [reviewing] court into abdicating its duty to appraise the whole record." (*People v. Johnson* (1980) 26 Cal.3d 557, 577.) In particular, we must take care not to " 'affirm[]

12

the trier of fact on isolated evidence torn from the context of the whole record [by] . . . leap[ing] from an acceptable premise, that a trier of fact could reasonably believe the isolated evidence, to the dubious conclusion that the trier of fact reasonable rejected everything that controverted the isolated evidence.' " (*Ibid.*)  Here, to hold there was substantial evidence that Sanford was present at the scene of the robbery, we would have to violate this principle by leaping to the dubious conclusion that the jury simply rejected Victoria D.'s description of the Magnum's driver at the scene and her later inability to identify any of the car's occupants when they were picked up.  We decline to do so.

The Attorney General points out that another distinction between *David K., supra*, 79 Cal.App.3d 992, and this case is that in *David K.* the minor did not meet the victim's description of the suspects' age and race.  Here, in contrast, Sanford matched certain attributes of witnesses' descriptions of the suspects because he is African-American and was wearing dark-colored jeans and sneakers.  In our view, these features are far too general to support a reasonable inference that he participated in the robbery at the jewelry store.  Being African-American and wearing common items of clothing such as jeans and sneakers, standing alone, do not constitute substantial evidence of identity.

III.
DISPOSITION

The judgment is reversed.

_____

Humes, P.J.

We concur:

_____

Margulies, J.

_____

Dondero, J.

Trial Court:

Solano County Superior Court


Trial Judge:

Hon. Donna Stashyn


Counsel for Defendant and Appellant:

Maureen M. Bodo, by appointment through First District Appellate Project

Counsel for Plaintiff and Respondent:

Kamala D. Harris, Attorney General

Gerald A. Engler, Chief Assistant Attorney General

Jeffrey M. Laurence, Senior Assistant Attorney General

Catherine A. Rivlin, Supervising Deputy Attorney General

Allan Yannow, Deputy Attorney General

*People v. Sanford*  (A145156)