Filed 1/20/26  P. v. Rico CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GERSON BRANDON RICO et al.,<br><br>    Defendants and Appellants. | G064169<br><br>(Super. Ct. No. 23NF2327)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge. Affirmed with instructions.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant Gerson Brandon Rico.

Jeanine G. Strong, under appointment by the Court of Appeal, for Defendant and Appellant Luis Elizarraras Alvarez.

James M. Kehoe, under appointment by the Court of Appeal, for Defendant and Appellant Valeria Estefania Rico.

Rob Bonta, Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

*     *     *

Defendants Gerson Brandon Rico, Luis Elizarraras Alvarez, and Valeria Estefania Rico were each convicted of two counts of robbery, one count of reckless evading, and one count of carjacking. On appeal, they raise multiple issues.

First, Gerson contends there was insufficient evidence to establish his guilt for any of the counts.[1] In the robberies and the carjacking, the perpetrators wore masks. None of the witnesses was able to positively identify Gerson. However, significant circumstantial evidence placed him at the scenes of the crimes, including his use of the stolen goods, his presence in the vehicles used to carry out the robberies, and a witness who positively identified his tattoos. This evidence was sufficient.

Second, Valeria contends there was insufficient evidence to convict her of the carjacking. However, similar circumstantial evidence placed her at the scene of the crime, and a witness provided testimony about an individual with a physical description that generally matched Valeria. This evidence was sufficient.

Third, Gerson and Luis contend it was error to admit Valeria's confession to a police officer, as it implicated them and they had no opportunity to cross examine Valeria in violation of the Confrontation Clause. However, we conclude the confession did not implicate them, and, in any event, its admission was harmless.

---

[1] Because two of the defendants share the same last name, we refer to the defendants by their first names. No disrespect is intended.

Fourth, Valeria and Gerson contend the prosecutor committed error by making arguments that improperly shifted the burden of proof. We conclude the arguments were a proper commentary on the evidence.

Finally, all defendants contend the abstracts of judgment reflect assessments that were not orally pronounced and must be stricken. The People agree. We agree with the parties and will order those assessments stricken from the abstract of judgment. In all other respects, we affirm the judgment.

FACTS

I.

CARJACKING (COUNT FOUR)

On July 23, 2023, around 8:05 p.m., Hasiba Munshi was sitting alone in her mother's 2019 black Porsche Cayenne, parked outside a department store in Montebello. She was parked "head in." At that time, a silver 4–door vehicle with tinted windows backed in next to her on the driver's side, making her uneasy. A female passenger got out of the front passenger seat, fumbled around in the trunk, made eye contact with Munshi, then returned to the passenger seat and the vehicle departed.

Munshi saw the woman from less than a car length away and described her as Hispanic, five foot six or seven, on the tanner side, around 180-200 pounds, with reddish brown hair.

Around 10 or 15 minutes later, the same silver car backed in again. The woman Munshi had seen earlier was no longer in the front passenger seat. A man got out from the front passenger side wearing a black ski mask. A second man wearing a ski mask and "on the heavier side" got out of the rear driver's side of the car. The second man put what appeared to be a gun to the window of Munshi's car and the window crumbled and shattered.

3

Munshi jumped out of the passenger side of the Porsche and ran, screamed for help and dialed 911. Munshi left her glasses and wallet with her driver's license, credit cards, cash, gift cards and IDs in the car. When she returned to the scene with police, Munshi saw that the Porsche and her personal items were gone.

Munshi initially told the police over the phone that there were four gunmen and later, on the same call, corrected herself to say there were three men. Munshi told the police she could not describe any of the men because they all wore ski masks. Munshi looked at a photo of the suspect silver car with tinted windows and observed that it looked very similar to the one that had parked next to her, but she was "not sure." She was unable to identify any of the perpetrators in a photo lineup.

Munshi's credit card was subsequently used by Gerson for drinks at a restaurant in the City of Industry that night at 9:38 p.m. and 9:46 p.m. Video from the restaurant parking lot shows a silver car similar to Valeria's car entering the lot at 8:47 p.m. On video, three people enter the restaurant and walk to a table where a group of three females were seated. Video also showed Gerson, Luis and Valeria leaving the restaurant.

II.

ROBBERY AT BREA MALL (COUNT TWO)

The following day, July 24, 2023, Elisa Cardenas had parked her rented Chevy Malibu in a Brea Mall parking structure when a gray car pulled up very fast and pinned her in. As she got out of her car, a man got out of the driver's side back seat of the gray car and put a gun between her eyes and said "Give me all your shit, you fucking bitch." She said "okay" and turned and leaned into the car to get her things. She unzipped her purse,

4

turned around and threw her billfold at him. The billfold contained $40 to $60, a driver's license, credit cards and a Texas license to carry firearms.

At that point, the man hit her back with the butt of the gun and demanded her watch, purse and phone. Cardenas fell halfway in the door and halfway into the passenger seat in a crouching position. She got up, said she'd give him everything, then threw her Rolex watch at him, gave him her purse and threw one of her two phones at him. He grabbed her things, went back to his car and got in the rear driver's side. Cardenas called 911 with a second cell phone as the suspect car drove away at a high rate of speed.

Cardenas saw two other occupants in the car: a driver, who she described as a man, bald or with very little hair, and a passenger, who she described as a woman with longer hair, light complected and very nervous, looking around everywhere, "almost acting as the lookout." At trial, Cardenas identified Luis as the driver of the car and Valeria as the front seat passenger. Cardenas testified that the man who hit her with the gun was wearing a gaiter-style mask on his face and she did not think she could identify him.

III.

RECKLESS EVADING (COUNT THREE)

Shortly after the Brea Mall robbery, dispatch put out a vehicle description of the suspect car, a silver Toyota Corolla. Officers in the vicinity of the mall saw a silver sedan run a red light and attempted to stop the vehicle.

As the officers followed the car, both the police vehicle and the silver sedan came to a stop and a male's arm with distinctive tattoos came out of the rear passenger side window and dropped credit cards and IDs out the window. The tattoos consisted of writing on the top of the hand, a space of

5

a couple inches, then more tattoos continuing up the arm. Sergeant Celmer was approximately 15 feet away when he observed this. Sergeant Celmer subsequently retrieved the cards that were thrown from the car.

Officer Wulff was driving directly behind the suspect Corolla. There was heavy traffic and the Corolla accelerated across three lanes of traffic to enter the 57 freeway at a high rate of speed. Wulff followed, with the Corolla hitting speeds of up to 100 miles per hour and making unsafe lane changes. At one point, the Corolla went onto the shoulder to pass a car. As a result of vehicle traffic, the Corolla gained ground, Wulff lost visual contact, and, due in part to safety reasons, the pursuit was terminated.

IV.

ATM ROBBERY (COUNT ONE)

A few days later, on July 27, 2023, at about 1:30 p.m., Joycelyn Allenegui withdrew $60 from an outdoor ATM at a Chase Bank across from the Brea Mall and returned to her vehicle. She sat in her car and closed the door. After about 30 seconds, the door was forcefully opened. Standing in the doorway were two individuals in face coverings, one of whom wore an orange or yellow sweatshirt. One of them pointed a firearm at her upper body. The assailants began pulling at her fanny pack, which she wore across her chest, and she started to scream and resist by kicking and fighting back. She heard two pops from the firearm and felt a piercing feeling on her arm. The assailants pulled her out of the car and gained control of the fanny pack. One of them pulled her wallet out of her pack. Having acquired the wallet, the assailants fled to a black Porsche Cayenne parked behind her; one jumped in the front passenger seat while the other jumped in the rear passenger seat.

Allenegui ran after them, opened the rear passenger door of the Porsche Cayenne and saw a third person in the driver's seat. The person in

6

the rear passenger seat fired the firearm again and Allenegui heard three pops. The suspects quickly closed the door and sped off, tires screeching.

After the car sped off, Allenegui examined herself and saw there were three wounds on her left side of her body from the shots fired: one on her arm, one on her shoulder and one on her side. The wallet that was taken had her driver's license, debit card, credit cards and IDs inside.

Allenegui had a phone call with the prosecutor in which she was asked for descriptions of the suspects; Allenegui said she was "pretty sure it was three guys." About the driver, she told the prosecutor: "I didn't observe any characteristics that would have suggested that was a female driver."

## V.

### INVESTIGATION AND APPREHENSION

On July 27, 2023, in connection with his investigation of the July 24, 2023, robbery at Brea Mall, Officer Blume went to a residence in La Habra, where the suspect silver Toyota Corolla was seen. Blume located the Corolla at around 10:00 a.m. and conducted surveillance. At around 11:15 a.m., he saw three people exit a nearby residence: a Hispanic male around five feet ten inches tall and 240 pounds with tattoos on his neck and arms, wearing all dark clothing; a second Hispanic male about five feet six inches tall and 140 pounds in a bright orange sweatshirt; and a Hispanic female in her mid-20s around five feet six inches tall and 160 pounds with long dark hair. The three left together on foot. Blume was working with other officers in surveillance, but around 11:30 a.m., the officers lost sight of the three people.

Around 1:00 p.m., Blume was notified of another robbery (the ATM Robbery) which led him to believe it was the same subjects. Blume conducted surveillance, looking for a black Porsche Cayenne. Blume saw the

Porsche driving around 300 or 400 yards from the residence where he saw the subjects earlier in the day.

Several officers conducted a stop. Upon seeing law enforcement, the same three subjects exited the car and fled. Blume identified them in court as the defendants. Blume cut off Gerson and stopped him. Officer Kowalec chased co-defendant Luis, who was shirtless and wearing black gloves. Kowalec caught up to Luis and Luis fell to the ground. Kowalec and Detective Cazarez took Luis into custody. Kowalec searched Luis and found gloves, a ski mask, a gaiter-type mask and a cell phone in his possession. Valeria ran northbound on the sidewalk and Special Agent Stearman of the Alcohol, Tobacco Firearms and Explosives (ATF) ordered her at gunpoint to stop; she complied. She was carrying an orange sweatshirt and had in her possession black gloves and a wallet that belonged to Allenegui, who had been robbed earlier that day.

After defendants were arrested, Officer Celmer was able to view the tattoos on Gerson's right arm. The tattoos matched those on the arm that Celmer saw on July 24 discarding evidence from the silver car.

Suzette Young, a crime scene investigator, was tasked with processing the silver Toyota Corolla that was believed to be involved in at least one crime at the Brea Mall. Inside, Young found a paystub, insurance registration for the vehicle, an envelope, and financing documents, all in Valeria's name. Young also found a document in Luis's name.

Young also processed the Porsche Cayenne recovered from the same residence where the Toyota Corolla was recovered. Inside, Young found an air pistol in the passenger rear door well.

Detective Montalvo worked on cell phone extraction on the phone taken from Luis upon his arrest. The phone was associated with an email

8

address of Louie.2002@icloud.com and username gleee.foeee on Instagram. A contact on the phone was "Luis mom." The phone search history included "Porsche vehicle tracking systems," "Porsche GPOS tracker, how to take off tracker – 2020 Porsche, how to take off tracker," and "Chase Bank." The "Chase Bank" search was conducted at 12:44 p.m. on July 27, 2023 (which, for frame of reference, was about 45 minutes before the ATM robbery of Allenegui at the Chase Bank).

Montalvo also found screenshots of maps on the phone, which were relevant because one can access a screenshot of a map without being connected to a cell phone data service. The phone had two photos of a map that was a couple miles west of the Brea Mall, which included routes that one could use to get to Brea Mall.

Montalvo looked at text messages to determine who was using the phone and found messages indicating that both Valeria and Luis were using the phone. A witness on behalf of Valeria testified that it appeared Valeria shared the phone with a male.

Investigator Linn, who works with the Orange County District Attorney's office, analyzed Luis's cell phone location data from July 23, 2023 (the day of the carjacking). That data reflected the phone's location approximately two miles from the store in Montebello around 8:39 p.m.; at 9:22 and 9:43 p.m., approximately 0.5 miles from the restaurant; then at 10:16 p.m., approximately 690 feet from Valeria's residence.

On August 3, 2023, after being released on bond, Valeria went to the counter of the Brea Police Department and asked about getting her Corolla out of impound. Detective Trent was at the counter and asked if she was involved in a robbery with that Corolla. Valeria replied, "not in that vehicle." Trent then asked her if she was involved in a robbery with another

car, she said that she was involved because she was with the wrong crowd and she was just hanging around and driving. She told Trent she was the driver of a black Porsche in that robbery. Trent had his body-worn cameras on at the time and the video was introduced and played at trial.

## STATEMENT OF THE CASE

By information, Gerson, Luis and Valeria were charged with first degree robbery at an ATM (Pen. Code, § 211, subd. (b); counts 1)[2], second degree robbery (§211, subd. (b); count 2), evading police with reckless driving (Veh. Code, § 2800.2; count 3) and carjacking (Pen. Code, § 215, subd. (a); count 4). The information alleged that Luis and Valeria were on bail at the time of the offenses (§ 12022.1, subd. (b).) As to counts 1, 2 and 4, the information alleged that the victims were vulnerable and the crimes involved great violence, planning and the taking of great monetary value. (Cal. Rules of Court, rule 4.421(a)(1), (3), (8) & (9)). The information further alleged that, as to count 2, Gerson used a weapon (*id.*, rule 4.421(a)(2)), and that as to counts 2 through 4, Gerson had prior convictions of increasing seriousness and had served a prior prison term (*id.*, rule 4.421(b)(2), (3)).

A jury convicted Gerson, Luis and Valeria as charged. The trial court dismissed the section 12022.1, subdivision (b) enhancement and found true the aggravating circumstances alleged under rule 4.421(a) (with the exception of (a)(3) (victim particularly vulnerable)). The court sentenced Luis and Valeria to an aggregate term of six years in prison consisting of one year and four months on count 1, one year on count 2, eight months on count 3 and the low term of three years on count 4 (designated the base term). The court sentenced Gerson to the same terms on counts 1 through 3 and a middle term

---

[2] All statutory references are to the Penal Code unless stated otherwise.

10

of five years on count 4 for an aggregate term of eight years. The court imposed a $300 restitution fine (§ 1202.4, subd. (b)) and a $300 suspended parole revocation fine (§ 1202.45). Although the court did not orally pronounce any non-punitive assessments at sentencing, each abstract of judgment reflects the imposition of a $160 court operations assessment (§ 1465.8) and a $120 criminal conviction assessment (Gov. Code, § 70373).

Gerson, Luis and Valeria filed timely notices of appeal.

## DISCUSSION

### I.

#### SUFFICIENCY OF THE EVIDENCE AS TO GERSON

We begin with Gerson's contention that the evidence was insufficient to convict him. Principally, his argument is that none of the victims positively identified him, and thus there was insufficient evidence that he was a perpetrator in any of the counts. As to Count 3, reckless evading, he contends he cannot be convicted because he was not the driver. As we have done, we will address the counts in chronological order (not numeric order).

When reviewing a claim of insufficient evidence on appeal, the reviewing court reviews the record in the light most favorable to the judgment below to see if there is substantial evidence which is reasonable, credible, and of solid value such that a reasonable jury could find the defendant committed the offense beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) The same standard of review applies in cases where the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) In light of this deferential standard of review, the defendant bears a heavy burden when claiming there is insufficient

evidence to support the conviction. (*People v. Sanford* (2017) 11 Cal.App.5th 84, 91 (*Sanford*).)

*A. Count 4 (the Carjacking)*

The evidence supporting Gerson's involvement with Count 4 is as follows: the victim, Munshi, described two men, one of which had a heavier build and used the gun, though both were masked. Shortly after the robbery, Gerson arrived at restaurant in the car that was used in the carjacking and he used Munshi's credit card. Photos from Valeria's cell phone depicted Gerson posing with the Porsche. Gerson contends this evidence shows only that he was in the car and used the credit cards, not that he participated in the carjacking.

We disagree. "We have recognized that '[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 731.) Here, the corroboration is that the witness's description of the assailants' builds matches that of Luis and Gerson, Gerson arrived at the restaurant in the same vehicle as was used in the robbery and in possession of the stolen property was shortly after the robbery—about an hour. Collectively, this was sufficient circumstantial evidence to support the jury's finding that Gerson participated in the carjacking.

In arguing otherwise, Gerson relies on *Sanford, supra,* 11 Cal.App.5th 84. There, the defendant had been convicted of robbery based on evidence that, ten minutes after the robbery, he had been found in one of the getaway vehicles. However, "no physical evidence linked him to the robbery, no witnesses were able to identify him, and other, uncontroverted evidence indicated that at least one of the car's occupants had changed between the

12

time of the robbery and the location of the car by the police." (*Sanford, supra,* 11 Cal.App.5th 84, 85.) The *Sanford* court described these as "unusual circumstances" (*id.* at p. 86), and noted that "being in a getaway car shortly after a crime and having some of the same general characteristics as the perpetrators will likely be substantial evidence of identity in cases where it is reasonable to infer that the occupants of the getaway car were unchanged." (*Id.* at p. 92.) However, under the unique facts of that case, the court concluded that any inference that the defendant committed the robbery simply because he was found inside the car was too speculative to support the judgment. (*Id.* at p. 86.)

Here, the clear point of distinction is that Gerson was not only in the vehicle used in the robbery, but he was also in possession of the stolen goods. That was not the case in *Sanford.* (*Sanford, supra,* 11 Cal.App.5th 84 at p. 91.) Moreover, there was no reason to suspect that the occupants of the Corolla had ever changed in this case. Accordingly, *Sanford* is distinguishable.

B. *Count 2 (Brea Mall robbery)*

As to Count 2, the evidence supporting Gerson's involvement was that the victim described three individuals involved: a male driver identified as Luis, a woman acting as a lookout, and a masked man who committed the robbery then got into the rear passenger seat of the Corolla. The police quickly located the Corolla and pursued it. During the pursuit, a tattooed arm reached out of a rear passenger window and dropped the stolen items. The tattoos matched Gerson's tattoos.

Gerson's only argument as to Count 2 is that "the tattoo description was vague." That argument does not hold water on appeal. Sergeant Celmer got a good look at the tattoos and accurately described the

basic structure of the tattoos on Gerson's arm. The jury could reasonably rely on his testimony to establish Gerson's identity.

*C. Count 3 (Reckless Evading)*

In addition to the identification evidence listed above, Gerson contends he cannot be convicted of reckless evading because he was not the driver. The evidence supporting his argument is that Sergeant Celmer saw Gerson's arm emerge from a rear passenger window. Additionally, the victim identified Luis as the driver. In closing argument, the prosecutor commented that Luis was the driver but argued the other two defendants were guilty as aiders and abettors under a theory of natural and probable consequences. The jury was instructed on that theory. Gerson has not addressed the prosecution's theory in his briefs on appeal.

We conclude the evidence supports the judgment. In *People v. Robins* (2020) 44 Cal.App.5th 413, we concluded that a defendant who aided and abetted an *Estes* robbery (by emerging from a getaway vehicle to help the thief avoid apprehension by a loss prevention officer) was guilty of reckless evading under a natural and probable consequences theory, even though he was not the driver. (*Id.* at p. 423.) We explained, "Defendant was waiting *in a getaway vehicle*, which was parked right in front of the store. Making a quick escape in the van was an essential part of the plan. Under these circumstances, a jury could conclude that the probability of an ensuing chase was sufficiently high to make it reasonably foreseeable." (*Ibid.*)

That holding applies here. "[A]n aider and abettor's liability for criminal conduct is of two kinds. First, an aider and abettor with the necessary mental state is guilty of the intended crime. Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a

14

"natural and probable consequence" of the crime aided and abetted.'" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117, 108 Cal.Rptr.2d 188, 24 P.3d 1210.) "'The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.]" [Citation.] Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'"[3] (*People v. Robins*, *supra,* 44 Cal.App.5th at p. 422.)

Here, Luis and Valeria were waiting for Gerson *in a getaway vehicle*. Plainly, it was objectively foreseeable that escaping in a vehicle could result in a police chase in which the driver would engage in reckless driving. Accordingly, the evidence supported Gerson's conviction for reckless evading.

## D. Count 1 (the ATM Robbery)

The evidence supporting Gerson's involvement in the ATM robbery was that the victim testified that three people were involved in the robbery, two assailants and a getaway driver. The three individuals arrived and fled in the Porsche that Gerson had previously stolen. Luis, Valeria, and Gerson were surveilled together both immediately before and shortly after the robbery. When police converged on the Porsche that had been used in the

---

[3] Although Senate Bill 1437 (2018) eliminated the theory of natural and probable consequences in the context of murder, and Senate Bill 775 (2021) extended that limitation to attempted murder or manslaughter, we are aware of no authority suggesting the theory of natural and probable consequences was eliminated more generally as a theory of aiding and abetting. (See generally *People v. Hin* (2025) 17 Cal.5th 401 (describing Sen Bill 1437 and Sen Bill 775).) Accordingly, we continue to follow *People v. Robins* (2020) 44 Cal.App.5th 413.

robbery, Gerson took off running. Inside the Porsche, police found an air pistol consistent with what was used in the ATM robbery.

Gerson's argument is simply that he was never positively identified. However, the circumstantial evidence here was quite strong, and the jury was entitled to rely on it to conclude that Gerson was involved in the robbery.

II.

SUFFICIENCY OF THE EVIDENCE AS TO VALERIA

Valeria contends the evidence was insufficient to establish her identification as the perpetrator in count 4, the carjacking. In particular, she notes that Munshi, the victim, was unable to positively identify her either in a photo lineup or in court. Moreover, Munshi's description of the female perpetrator was not an exact match for Valeria. Munshi described the female perpetrator as Hispanic, 5'6" or 7", 180-200 pounds, with reddish brown hair. The probation report describes Valeria as Hispanic, 5'4", 160 pounds, with brown hair.

We conclude the evidence was sufficient. There was significant circumstantial evidence indicating Valeria participated in the carjacking. First, it was her car that was used in the carjacking. Second, the phone that Valeria and Luis shared pinged a cell phone tower near the location and time of the carjacking. Third, the same phone pinged the restaurant approximately 20 minutes after the carjacking, where Valeria was identified. Fourth, a stolen credit card was used at that restaurant. Although Valeria did not use it, she was in the party that used it. Valeria then exited the restaurant with Gerson and Luis and drove to Valeria's home.

Additionally, in our view, Munshi's description of Valeria was close enough to be considered relatively accurate. Munshi testified that she

16

"didn't take a clear look [at] her" but then gave a description that, though not totally accurate, was not very far off. A couple inches and 20 pounds off is fairly close given that it was night time and Munshi did not take a close look. Moreover, the reddish-brown versus simply brown hair is also fairly close under the circumstances. Considered together, the circumstantial evidence and the relatively accurate description of Valeria furnished substantial evidence to conclude that Valeria participated in the carjacking.

III.

VALERIA'S CONFESSION WAS PROPERLY ADMITTED

Next, both Gerson and Luis contend it was error to admit Valeria's confession because it violated their right of confrontation under the Sixth and Fourteenth Amendments as interpreted by *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*). In her confession, Valeria told Detective Trent that she was involved in a robbery with the black Porsche as the driver and she got involved by "hanging out with the wrong people." The jury was instructed to consider this admission only against Valeria.

In *Aranda*, decided in 1965, our high court announced a judicially declared rule of fairness that where one defendant has made a confession that implicates another defendant, they can be tried together only "if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant." (*Aranda, supra,* 63 Cal.2d at p. 530.) The trial court must exclude the confession "if effective deletions are not possible." (*Ibid.*) A few years later, in 1968, the United States Supreme Court held that admission of a confession by one defendant that incriminates a codefendant violates the nonconfessing defendant's right

17

of confrontation, even if the jury is instructed to disregard the statement as to the nonconfessing defendant. (*Bruton, supra,* 391 U.S. at pp. 135-137.)[4]

The United States Supreme Court subsequently narrowed the reach of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200 to a confession that is "incriminating on its face." (*Id.* at p. 208.) Confessions that become incriminating "only when linked with evidence introduced later at trial" are not barred by the Confrontation Clause. (*Ibid.*) The court explained that where the confession is not incriminating on its face, it is more likely that a jury will be able to obey the instruction to consider the confession against only the confessing co-defendant. (*Ibid.*) The *Richardson* court expressly left open the question of whether a confession that had been redacted to replace the defendant's name with a symbol or neutral pronoun would be admissible. (*Id.* at p. 211, fn. 5.)

Whether an out of court confession can be effectively edited requires a case-by-case analysis (*People v. Fletcher* (1996) 13 Cal.4th 451, 456 (*Fletcher*).). "Whether instructing the jury to disregard a nontestifying codefendant's confession in determining a defendant's guilt adequately protects the defendant's Sixth Amendment right of confrontation depends upon whether the jurors can reasonably be expected to obey the instruction." (*Id.* at p. 465.) "In turn, the jurors' ability to obey the instructions depends upon how directly and how forcefully the codefendant's confession incriminates the nondeclarant defendant." (*Ibid.*) "Substituting a pronoun or other neutral term for the defendant's name will make the confession less

---

[4] *Aranda,* as a judicially created rule of evidence, was abrogated in 1982 by the "truth-in-evidence" provision of Proposition 8. (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.) The issue is now solely governed by federal constitutional principles. (*Ibid.*)

directly incriminating, but it does not invariably provide sufficient assurance that the average reasonable juror will be able to obey an instruction to disregard the confession when considering the guilt of the nondeclarant. A confession redacted with neutral pronouns may still prove impossible to 'thrust out of mind' [citation] if, for example, it contains references to distinctive clothing, mannerisms, place of residence, or other information that readily and unmistakably identifies the person referred to as the nondeclarant defendant." (*Id.* at pp. 465-466.) A "redaction that replaces the nondeclarant's name with a pronoun or similar neutral and nonidentifying term will adequately safeguard the nondeclarant's confrontation rights unless the average juror, viewing the confession in light of the other evidence introduced at trial, could not avoid drawing the inference that the nondeclarant is the person so designated in the confession and the confession is 'powerfully incriminating' on the issue of the nondeclarant's guilt." (*Id.* at p. 467.)

  *People v. Burney* (2009) 47 Cal.4th 203, 231 (*Burney*) is instructive. There, the defendant and two co-defendants were charged with murder, and all three gave extensive confessions to law enforcement, though their confessions were not entirely consistent, as each shifted blame to the others. The two co-defendants named the defendant as the shooter. Their confessions were redacted to replace the defendant's name with "the other." (*Burney* at p. 228.) Our high court held this was insufficient: "the redacted statements of [the] codefendants . . . did not completely eliminate any reference to the 'existence' of accomplices [citation] and, as the Attorney General concedes, the statements in conjunction with other evidence led to the obvious inference that defendant was 'the other' who shot [the victim]. [Citation.] The redactions in the present case did not satisfy the standard set

19

forth in *Gray, supra,* 523 U.S. at pages 196–197.. As explained above, when, despite redaction, a codefendant's statement obviously refers directly to the defendant and implicates him or her in the charged crimes, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause." (*Burney, supra,* 47 Cal.4th at pp. 231-232.)

We hold that Valeria's confession did not violate Gerson's and Luis's right of confrontation. Valeria's confession, as edited, established, at most, that others, the number and identity of whom were unspecified, were involved in an unspecified robbery or robberies that involved a black Porsche. It did not lead to an inevitable conclusion that Luis and Gerson were the others involved. Their primary defense at trial was identification. Nothing about Valeria's confession undermined that defense. The fact that multiple individuals were involved in the robberies and that a black Porsche was involved was undisputed. As it pertains to any accomplices, therefore, Valeria's confession merely reiterated the obvious. In this regard, the present case is readily distinguishable from *Burney* in that there was so little detail in Valeria's confession that, even when considered in light of other evidence, it was not obvious who the others involved in the robberies were. The prosecution had to establish identification with other evidence, and Valeria's confession did not aid in carrying that burden. It was not powerfully incriminating, and thus we cannot draw the inference that the jury was unable to follow the instruction to consider her confession only against her.

In any event, we would consider any error to be harmless under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24, which requires reversal unless the error was harmless beyond a reasonable doubt. Any error would be harmless for the same reasons we articulated above: the confession

did not incriminate Luis and Gerson; Valeria's confession merely covered undisputed ground (that multiple people were involved in a robbery and that a black Porsche was involved); and it was cumulative of other admissible evidence. It did not impact the outcome of the trial.[5]

IV.

THE PROSECUTOR DID NOT ERR

Gerson and Valeria contend the prosecutor erred by making certain comments during closing argument that, in their view, impermissibly shifted the burden of proof. We disagree with that characterization and find the argument was proper.

The factual background of this argument is as follows. During closing arguments, in support of Valeria's argument that she was not the perpetrator, she suggested the prosecutor failed to subpoena her employer to determine her whereabouts, stating, "We got these pay stubs here. I didn't put that in evidence. [The prosecutor] has the power of subpoena. If he wanted to contact Site Crew and say, 'Hey, Valeria Rico is one of your employees. I would like to know her whereabouts on X, Y, Z.' They could do that." The prosecutor responded to this argument in his rebuttal: "And I know there was some talk from the Defense about well, you know, maybe it's possible, you know, she had a job at some point, maybe it's possible she was at work during some of these things. And they said I have subpoena power. I could have brought in people from her work to exclude that. Well, you know what, she has the subpoena power too." Defense counsel objected, and the court sustained, stating: "The burden is entirely on the People. You can't

---

[5] Because Valeria's confession was admissible in a joint trial and was harmless, there was no abuse of discretion in the trial court's refusal to sever Gerson's and Luis's trial from that of Valeria's trial.

allude to the fact that the Defense should present anything." The prosecutor went on: "I'm not saying that the Defense has to present anything, but they could have. Right. I'm saying they could have. I'm not saying they have to. I don't want to confuse the burden at all. It is completely on me. But I am saying, why didn't they? They could have. It's not out there. It doesn't exist." Defense counsel again objected, and the court again sustained. In neither instance did defense counsel request an admonition.

This was not prosecutorial error, and, in fact, the argument should have been permitted. Moreover, the issue was forfeited by the failure to request an admonition.

"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305 (*Gonzales*).)

"As for the prosecutor's reference to witnesses not called, it is neither unusual nor improper to comment on the failure to call logical witnesses." (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.) Here, if Valeria contended she could not be the perpetrator because she was at work at the time of the offense, it would be far more logical for her to call a witness to establish that fact. The prosecutor has no knowledge of her work schedule and is not required to eliminate every possible defense Valeria might have raised. The prosecutor's comments, which were simply a response to Valeria's counsel's comments, were a proper commentary on the state of the evidence.

In any event, the issue was forfeited. "'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.'" (*People v. Friend* (2009) 47 Cal.4th 1, 29.) There was no reason to believe an admonition would have been futile here, and defense counsel did not request one.

## V.

### THE NON-PUNITIVE FEES MUST BE STRICKEN

Defendants contend, and the People agree, that the $160 court operations assessment (§ 1465.8) and $120 court facilities assessment (Gov. Code, § 70373) must be stricken because they were not orally pronounced by the trial court. Indeed, the court found defendants did not have the ability to pay those fees, yet they appear on the abstract of judgment for each defendant.

"It is well settled that '[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. [Citation.]' [Citation.] When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties." (*People v. Jones* (2012) 54 Cal.4th 1, 89.)

We will order the $160 court operations assessments and the $120 court facilities assessments stricken from the abstracts of judgment.

23

## DISPOSITION

The trial court is ordered to correct the abstracts of judgment to delete the $160 court operations assessment (§ 1465.8) and $120 court facilities assessment (Gov. Code, § 70373) from each abstract. In all other respects, the judgment is affirmed.


SANCHEZ, J.

WE CONCUR:


MOORE, ACTING P. J.


BANCROFT, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.